[No. 1528.  Decided March 27, 1895.]

JOHN HAYNES, *Appellant*, v. THE SPOKANE CHRONICLE PUBLISHING COMPANY, *Respondent*.

LIBEL—WHAT CONSTITUTES — JUSTIFICATION — PLEADING — EVIDENCE — FINDING OF JURY — REVIEW.

The publication by a newspaper as an item of news of certain actions and conduct of an individual, at the time of the supposed discovery of a crime, from which damaging inferences might be drawn as to his having committed the crime, is not libelous, there being no direct charge of crime, if what is stated concerning his actions and conduct is true.

Under Code Proc., § 212, the truth of the statement of acts and facts may be shown to defeat recovery in an action for libel, although it is pleaded merely in mitigation of damages and not by way of justification.

A publication which appears libelous upon its face may not be so in fact, by reason of something which is not apparent from the words themselves, and which may be shown by pleading and proving extrinsic facts in mitigation or in justification.

The finding of a jury upon the question whether a publication is within the definition of libel correctly given them by the court, will not be disturbed.

Appeal from Superior Court, Spokane County.

*Richardson & Gallagher*, and *Fenton & Henley*, for appellant.

*Blake & Post*, for respondent.

The opinion of the court was delivered by

ANDERS, J.—This is an action to recover damages for an alleged libel published by the respondent corporation in the Spokane *Daily Chronicle*, a newspaper of which it was the publisher and proprietor. The complaint is in the usual form, and sets forth in full the publication alleged to be libelous, and which, it is as-

serted, was printed and published of and concerning the plaintiff, and which reads as follows:

### "FOUND HIS BONES.

PEACEFUL VALLEY PEOPLE ARE ANXIOUS TO KNOW IF OLD MR. MURPHY WAS MURDERED — SAID TO HAVE BEEN A CRIME — POLICE ARE NOT CERTAIN WHO WAS KILLED OR WHO IS GUILTY, BUT ARE INVESTIGATING.

" Peaceful Valley is not peaceful to-day. The quiet little settlement on the south bank of the river, west of Monroe street, is bubbling over with suppressed excitement and rumors of murder and mystery. The coroner, policemen and detectives have entered Peaceful Valley, and the people can discuss nothing but skulls and bones and shallow graves, through which the clear spring water is slowly seeping to supply the settlement under the hill.

" The police say there is a mystery and perhaps a murder to be investigated, and they began their work in earnest to-day. The people of Peaceful Valley are satisfied that a foul murder has just been brought to light after years of careful concealment.

" The skull and bones that call for an account were found last Saturday on the steep hillside near the foot of Oak street. Franz Pietsch, a German who has a fine garden at the foot of the hill, wanted to increase his supply of spring water. The hillside is full of springs, and the West Riverside Land Company readily gave him permission to run a drain across their land and bring water from it to his garden.

" Friday afternoon he began work with his son Max and Mike Sullivan. They had hardly started digging when John Haynes, whose whitewashed cabin stands on the next lot, ordered them to go away. They told him they were not on his land or cutting off his water supply. He insisted that they were cutting off the water from his land.

" Finally, it is claimed, his wife came out and commenced piling brush in the ditch they were digging. As it was nearly 5 o'clock, and as Mrs. Haynes is at this time in a delicate condition, they decided not to resist her and went home. Mr. Pietsch notified the

authorities, but they thought the case did not warrant interference.

"Saturday morning the men returned, cleared out the brush and resumed work. They had a trench twenty feet long and from two to three feet deep when Haynes reappeared. Once more he ordered them to stop work and when they refused he went back to the house and led Mrs. Haynes back to the ditch.

"Mike Sullivan was working in one end of the ditch and had just reached the edge of a round pit two feet across and twenty inches deep, which was in the line of the ditch. Mrs. Haynes jumped into that end of the ditch and when he thrust the shovel into the ground she stepped on it. He tried to raise the shovel, but Mrs. Haynes weighs about 200 pounds, so he gave it up and tried another place. Again she stepped upon the shovel. For several minutes this game went on.

"Finally the other men noticed that she devoted all her attention to Sullivan and began joking about it. Haynes heard them and called her back to the house, himself starting to town to get an officer.

"Sullivan kept digging and in a few minutes his shovel struck something hard. With another minute's work he threw out a human skull. It was lying about two feet under ground but only a foot distant from the bottom of the shallow hole previously described.

"Following the trace they found the jaw bone, then the vertebræ and ribs, but neither arm nor leg bones. The body seemed to slant downward, and lay as if the shallow hole had been dug first and from it a tunnel had been driven slanting downward, just large enough so the dead man's body could be thrust into it easily.

"The bones were put in a bucket and carried to Mr. Pietsch's house where they were examined by all the neighbors. Death-on-Trail unhesitatingly pronounced it a white man's skull which may have been buried four or five years ago. Other old settlers are of the same opinion, and say the low cheek bones and broad well formed skull belonged to a Caucasian.

"'Has any white man disappeared in this neighbor-

hood ? ' inquired Officer Davenport, who was sent this morning to investigate the case.

"'There was an old bachelor named Murphy,' said Mr. Pietsch to whom the question was addressed. 'He used to have a garden on this hillside, and Haynes worked for him five or six years ago. Haynes has told me that he afterward bought the garden from the old man who went back to Canada, but there are rumors that the old man never reached Canada and letters came from there inquiring about him.'

"'What did Haynes say when you showed him the skull ?'

"'Well,' said the old man hesitatingly, 'he looked awful queer and angry. I can't tell how he did look.'

"'He didn't say anything,' said Mike Sullivan, who was asked the same question. 'He would hardly look at the bones at all.'

"Mr. Haynes was not at home, so his version of the story could not be obtained. The neighbors are divided in their opinion. Some think it was the body of some Indian who died of fever and sweat house treatment. Others believe it to be the body of Murphy and demand investigation. In any case those who drink spring water are not sorry to have it taken out of the hillside.

"Coroner Newman visited the spot this afternoon in company with Officer Sheahan and examined the remains carefully. He was unable to decide with certainty whether the bones are those of a white man or of a squaw, but decided not to hold an inquest. Judging from the skull he believes it belonged to a middle-aged or elderly person, and has been in the ground five or six years. The officers will continue the investigation."

The complaint further alleges:

"That said defendant in said article so published falsely, unlawfully and maliciously, intended to and did accuse and charge this plaintiff with the crime of murder, and with an attempt to conceal the crime of murder, and thereby meant and intended to have it

understood, and it was so understood by the readers of said article so published in said paper, that the plaintiff was guilty of the crime of murder, and had murdered a human being and was attempting to conceal such murder, and defendant did further, by said publication of said article, bring this plaintiff into public contempt, hatred, ridicule and scorn, and thereby deprived plaintiff of the benefit of the public confidence and social intercourse and esteem, and plaintiff has by reason of said publication of said article ever since been, now is and will continue to be the object of public scorn and execration, and the publication of said article has greatly injured plaintiff's good character and reputation, and has caused and will continue to cause this plaintiff great mental pain and suffering, all to his damage in the sum of twenty thousand ($20,000) dollars.''

. The defendant in its answer admitted the publication, but denied the meaning ascribed to it in the complaint, and averred, affirmatively, in mitigation of damages, that the article was published as a legitimate item of news, without malice or any intention on the part of the defendant to injure or damage the plaintiff or his reputation, and that each and every statement of fact, matter and thing contained and set forth in said article was absolutely true. From a judgment upon the verdict of the jury in favor of the defendant, the plaintiff appeals to this court.

It will be seen by an inspection of the alleged libelous publication that the appellant was not therein or thereby directly charged with the commission of the crime of murder, or with the intention of concealing such crime. But a direct and specific charge of crime is not necessary in order to render a publication libelous. It is sufficient if the language used, in its ordinary acceptation, falsely and maliciously tends to produce such an effect on the mind of the reader. *Brad-*

*ley v. Cramer*, 59 Wis. 309 (18 N. W. 268, 48 Am. Rep. 511); *Solverson v. Peterson*, 64 Wis. 198 (25 N. W. 14, note 1; 54 Am. Rep. 607).

In the publication now under consideration the only allusions to the appellant are those in which he is stated to have done or said certain things, and from these statements he draws his conclusion that the respondent feloniously and maliciously intended to, and did, accuse him of the crime of murder, and with an intent to conceal the crime of murder, and thereby meant and intended to have it so understood, and that it was so understood by the readers of the article so published in said paper. And it is strenuously insisted on behalf of the appellant that the article in question is susceptible of the construction placed upon it by the appellant; that it is libelous *per se,* and that the court erred in admitting testimony to prove the affirmative matters set up in the answer.

Assuming that the publication is libelous, and therefore injurious to him, the appellant claims that he is entitled to recover the actual damage occasioned thereby, and that the evidence introduced over his objection was incompetent, irrelevant and immaterial, and should have been excluded by the court. The argument in support of this proposition is that, inasmuch as this court has heretofore declared that punitive damages are not recoverable in this state in actions for tort unless provided for by statute, it necessarily follows that neither good faith, absence of malice, nor any other circumstance, can be shown to reduce or mitigate the damages caused by a libelous publication. Several authorities are cited which seem to sustain appellant's position, and his contention would be entitled to careful consideration if it were necessary to the decision of this case.

The fundamental question on the trial of every action

for libel is whether the publication complained of is in fact libelous, and, if it is not, then all other questions which might otherwise arise become unimportant. A publication which appears libelous upon its face may not be so in fact by reason of something which is not apparent from the words themselves, and which may be shown by pleading and proving extrinsic facts.

Conceding, but not deciding, that this publication is *prima facie* libelous, and therefore injurious to the reputation of appellant, the question arises, has this import of the publication been changed by the pleading and proofs? In our opinion it has. Our statute provides that in an action for libel or slander the defendant may in his answer allege both the truth of the matter charged as defamatory and any mitigating circumstance to reduce the amount of damages; and whether he prove the justification or not he may give in evidence the mitigating circumstances. Code Proc., § 212. And it was held under a similar statute, in *Fink v. Justh,* 14 Abb. Pr. (N. S.) 107, and in *Kelly v. Taintor,* 48 How. Pr. 270, that the same matter may be pleaded both in justification and in mitigation of damages; and the same matters were so pleaded in the well considered case of *Eviston v. Cramer,* 54 Wis. 220 (11 N. W. 556). And that being so, it follows that the truth, however pleaded is available as a defense in any case. The statute says any mitigating circumstance may be alleged in the answer, and we can conceive of no circumstance more potent than the truth of the alleged defamatory matter. If the language complained of in this case imputed the crime alleged in the complaint, or any crime or moral obliquity whatever, to the appellant, it was not, as we have said, because of any direct assertion to that effect, but be-

cause of the inferences that might possibly be drawn from the facts stated. And, if what was stated concerning appellant's actions and conduct was true, did the statement of the truth render the publication libelous simply because the truth so stated was liable to suggest damaging inferences concerning him? We think not.

From what we have said it will appear that, in our opinion, the respondent's allegation of the existence of the facts contained in the alleged libelous article was eminently proper. And it appearing from the bill of exceptions that the allegations of the answer were supported by the proof, it necessarily follows that the appellant was not entitled to damages, and that the verdict and judgment were right.

If it be suggested that this view of the effect of the defense interposed by the respondent gives equal weight to matters alleged in justification and those alleged in mitigation merely, our answer is, that the effect of the defense is to be determined by its averments rather than by what the pleader may allege the object of the defense to be.   *Kelly v. Waterbury*, 87 N. Y. 179.

Of course, if the matters pleaded simply tend to rebut malice or to show a reasonable belief of the truth of. the publication, they can have no other or further effect, but where the truth is alleged it must be given its legitimate effect, as truth.   Probably the same matters here alleged by way of mitigation would also have been pleaded in justification but for the fact that the defendant denied that the publication complained of would bear the construction sought to be placed upon it by plaintiff.

The question of " libel or no libel " was one which the defendant had a. right to have submitted to the jury, and in our judgment it was properly submitted.

The learned judge below correctly defined what is a libel in contemplation of law, and left it to the jury to say whether the publication in question fell within the definition; and the rule in such cases is that, whichever way the jury finds the court will not disturb the verdict.    13 Am. & Eng. Enc. Law, pp. 381, 382.

The jury were properly instructed as to the rules of construction by which they were to determine the meaning of the publication, and were told, in effect, that if the article was a libel on the plaintiff he was entitled to damages, and that the motive of the defendant in publishing it was immaterial.   The verdict of the jury necessarily negatives the libelous character of the publication, and under these circumstances we would not be justified in reversing the judgment, even conceding that the court erred, as claimed by appellant, in charging the jury concerning the questions of malice and damages.

We purposely refrain from discussing several questions raised in the brief of counsel for appellant, for the reason that what we have already said disposes of the case.   We percieve no prejudicial error in the record, and the judgment is therefore affirmed.

HOYT, C. J., and DUNBAR, GORDON and SCOTT, JJ., concur.