## HOLDEN v. AMERICAN NEWS CO. et al.
### No. 323.

District Court, E. D. Washington, N. D.
Oct. 7, 1943.

26

Edge, Davenport, Keith & dePender, of Spokane, Wash., and John T. Raftis, of Colville, Wash., for plaintiff.

Thomas A. E. Lally, of Spokane, Wash., for defendants.

SCHWELLENBACH, District Judge.

This is a libel action in which the defendants have interposed motions for judgment non obstante veredicto and for new trial after the return of a jury's verdict in favor of plaintiff. The article alleged to be libelous was published in the December 22, 1942, issue of Pic Magazine. The American News Company, a New York Corporation (hereafter called the Company) whose business it is to distribute magazines throughout the United States, and C. A. Hawksley, the local representative of the Company, are defendants. In the original complaint, Street & Smith Publications, Inc., a New York corporation which published the magazine, was also joined. I granted that defendant's motion to quash the service on it because it did no business and had no agent in Washington. For a proper understanding of this case, a brief delineation of its historical background is necessary.

Early in 1942, the Congress adopted legislation providing pensions for government employees, including members of Congress. Shortly thereafter the Secretary of the Spokane Chamber of Commerce conceived the idea that the repeal of that portion of the legislation referring to Senators and Congressmen might be effected through a technique of ridicule. In his search for an organization to sponsor such a movement, he determined that the Spokane Athletic Round Table was admirably fitted for that purpose. The Spokane Athletic Round Table has existed for a number of years. It has maintained club rooms and, prior to this occasion, had limited its public activities to the support of athletics and the sponsorship of many spectacular activities which, because they involved clever and wholesome humor, had received much popular approbation. Joseph A. Albi was president of the Round Table. Whether it was he or someone else within the organization who possessed the penchant for publicity, someone had always successfully piloted the organization through its very successful campaigns. The Chamber of Commerce Secretary presented to Mr. Albi the proposition that the repeal of the Congressional Pensions Act could be secured by the launching of a drive for "Bundles for Congress." During the year prior thereto, the very serious "Bundles for Britain" campaign had been carried out throughout the United States. Mr. Albi and the Board of the Athletic

Round Table quickly accepted the idea. Appreciating the need for publicity, they first contacted the publisher of the Spokane Spokesman-Review, a morning newspaper of wide circulation. As a result of that contact, the plaintiff, political reporter and sometime editorial writer for the paper, was assigned the task of developing publicity for the campaign. The history of the campaign and its success is too well known to require recital here. The evidence is undisputed that plaintiff took an active part in the campaign in so far as the newspaper publicity was concerned. A short time thereafter Congress capitulated and repealed the legislation. A number of months later Pic Magazine caused to have printed the article upon which this action is based. The December 22, 1942, issue refers to the article in the Index as "America Last." It is a two-page spread with pictures of Mr. Albi and the plaintiff at the top, also a picture of what Albi described as a "Coochie Bird," which consisted of a pine cone with a bird's head on it assembled on a stand, addressed to one of the members of the United States Senate, plus a picture of Thomas Masuda and his wife with a legend under it— "Thomas Masuda (above) and his wife look over an exhibit used in the Government's case against Masuda, acquitted of being an unregistered Japanese agent." Under the Coochie Bird is the legend: "'Bundles for Congress,' an attempt to smear Congress, was organized by Joseph Albi and Ashley Holden." Under Albi's picture, the legend "Joseph Albi, Unamerican citizen, was one time an honorary member of the Italian consulate in Spokane, recently failed to gain Congressional nomination." Under plaintiff's picture is the legend: "Ashley Holden, a pal of the Japanese, acted as liaison between Jap and U. S. business interests, attempted to convince them of Jap goodness." The title of the article in bold face type "They Plotted 'Bundles for Congress.'" The body of the article appears in the footnote.[1]

---

[1] Shortly after the passage of the act which authorized members of Congress to enter the retirement system applying to government employees, one Joe Albi, of Spokane, Washington, who is the leading spirit of a play organization known as The Athletic Knights of the Round Table, conceived the idea of the Bundles campaign. In order to publicize it, he sought and received the assistance of one Ashley Holden, a political and editorial writer on a newspaper called the Spokesman-Review of Spokane, Washington, which is the largest daily in eastern Washington. The campaign to smear Congress was then set in motion by these two men.

Their previous affiliations are all the more interesting by reason of their authorship of this campaign of villification.

Joe Albi is an American-born Italian, and is a practicing attorney in Spokane. On November 11, 1929, he was appointed Acting Consular Agent of the Italian Government. He served in this capacity until July 15, 1941, when, on the President's orders, all Italian consular offices were closed. Italy is under a dictatorship, and dominated entirely by the personality of one man—Mussolini. Serving in the capacity mentioned, Albi thus became and remained the personal representative of Benito Mussolini until July 15, 1941.

As a co-author of the Bundles for Congress campaign, his past connection with the Fascist Government is interesting— and significant.

Ashley Holden is influential in shaping the editorial policy of The Spokesman-Review. He had been frequently regarded by citizens of the State of Washington as a publicist of Japanese business interests. He had appeared in the political picture of the Pacific Northwest at times when protests were being registered against the sale of scrap iron to Japan. His expressed friendship for the Japanese and the Japanese Government made his attitude in such matters very evident to the people of that section.

A Japanese lawyer by the name of Thomas S. Masuda was recently placed on trial in the United States District Court for the Western District of Washington, at Seattle. Ashley Holden had been in touch with an agent of our government, and gave that agent certain information about Masuda. The Government then subpœnaed him as a witness, but when he appeared at trial time he surprised the Government attorneys by stating that he did not recall making the statements to the agent attributed to him, whereupon the Government dismissed him as a witness. Holden immediately was examined by Masuda's lawyer and became a favorable witness on behalf of the defendant, who was charged with being an unregistered agent of the Japanese and acquitted.

Holden testified at the Masuda trial that he has been in the newspaper business for approximately twenty years; that he had resided in Spokane for six years, and prior to that time, had resided in Seattle for about fifteen years.

In plaintiff's amended complaint, he alleged the particulars in which he asserted the article was untrue, libelous and defamatory. There was no allegation of special damages, but it was alleged generally that plaintiff had been damaged in the amount of $250,000. The jury returned a verdict of $15,000.

The defendants admitted publication of the article and set up certain affirmative defenses, the details of which will be discussed later. The chief of these were: (1) The truth of the article, (2) That the article was privileged and, having been published without malice upon their part, plaintiff was not entitled to recover from them, (3) That they were simply the distributors of the Magazine and had no knowledge of its contents. The main issue in the case was the defense of truthfulness. Since, on this motion, I must consider the evidence most favorable to the plaintiff, I will review his own testimony as to his relationship with the Japanese.

Shortly after the last war, in which plaintiff served, he took a short journalism and advertising course at the University of Washington. Upon finishing that course, he was employed to cover the water front for the Seattle Daily Journal of Commerce. That paper is a purely commercial publication, maintained to supply the business interests of Seattle and the members of the bar with information concerning court records, reports of City and County business, the time of arrival and departure of ships and any other information of interest to Seattle business. It is a remarkably reliable publication and does a fine job of factual reporting of business information concerning the City and the Port of Seattle. Plaintiff worked on that paper for three years. In so doing, he contacted many Japanese ships which entered the harbor. He became acquainted with local representatives of Japanese shipping concerns and became imbued with the belief that the future of the Puget

He testified that he had known Masuda for at least fifteen years, and that he had had business, professional, and social contacts many times with the defendant Masuda. He further testified that he had been a member and also secretary of the Seattle-Japan Society, which was an American organization, composed of business men, professional men, educators, clergymen, and outstanding Japanese businessmen. The primary purpose of the organization was to promote trade and commerce between this country and Japan.

He stated that he had been personally acquainted with all the Japanese consuls in Seattle since 1919. He stated that when Masuda graduated from law school, he (Holden) endeavored to help him get established in the legal profession. He testified that he had met Masuda at Olympia, the State Capital. He stated that Masuda was much interested in the resolution before the Legislature which called for an embargo on material being shipped to Japan.

In response to questions by counsel for Masuda, he testified that out of his experience and acquaintanceship with Japanese, it was quite customary for the Japanese to make gifts to friends or acquaintances, and to those who had done favors for them, and that he had been the recipient of such gifts upon "numerous occasions," including gifts from the last Japanese consul in Seattle.

Holden stated that the Japan Society published a bulletin for its own members called the "Japan Society Bulletin," and that he assisted.

Holden testified that the Japan Society of Seattle was organized in 1923, and that he served in a purely honorary capacity until about 1927 or 1928, at which time he was paid a monthly stipend for two or three years, until he resigned the position to leave Seattle. He testified that he had run for a post on the City Council of the City of Seattle, and that at that time he had been known as "Banzai" Holden; that he had been the subject of cartoons which identified him as "Banzai" Holden. He stated that the term "banzai" is a sort of salutation in Japanese. He further testified that he had made one trip to Japan in 1939, which was financed by the Japan Society, of which he was then secretary. He stated that the Seattle-Japan Society did not furnish all the money for this trip, but that he took the trip "as its secretary."

He testified that the present Mrs. Masuda (wife of the defendant) was his secretary while he was acting as secretary of the Seattle-Japan Society.

The long-time official agent of Benito Mussolini and the long-time friend of Japan must chuckle to themselves as they contemplate their cleverness in enlisting a considerable part of the press of the country in their campaign. Some good may come out of it since we now know how our domestic experts in smear technique set about to discredit a parliamentary body.

Sound area depended upon the development of Oriental trade and the maintenance of friendly trade relations with Japan. In about 1923, he left the paper and became public relations man with the Pacific Coast Coal Company. The Pacific Coast Coal Company has a variety of interests among which is selling coal. To a greater extent than other lines, the Japanese lines used coal in the operation of their ships. As a part of his duties, plaintiff became the representative of the coal company whose business it was to entertain the visiting officers on the Japanese freighters and liners. He had an expense account for that purpose. He entertained them at golf and other social activities. He became acquainted with the Japanese Consuls and Vice-Consuls in Seattle and went to parties at which prominent Japanese were entertained. About 1923, the idea was conceived in Seattle of forming a Japan Society. The evidence does not disclose who was the originator of it. Its first meeting was held at the Seattle Rainier Club under the sponsorship of Corwin S. Shank, a prominent Seattle attorney whose interest in Japan probably had its inception because of his activities in the Baptist Church. Many prominent Seattle business men sensed in the movement an opportunity for the furtherance of trade relations with Japan and the improvement of their own business opportunities and they not only joined but took an active part in the Society. The Seattle Chamber of Commerce nurtured it. Its roster contained the names of many of Seattle's most important business men. There can be no doubt that in these activities these men were actuated by entirely proper business motives and were blissfully ignorant of the political implications or the international aspects which motivated the local Japanese in their cordial cooperation in furthering the aims of the Society. Plaintiff became the unpaid secretary of that organization. He remained as unpaid secretary until about 1928 when he became the paid secretary having severed his connection with the Pacific Coast Coal Company. At about that time, he organized a personal advertising agency. It never flourished but he did succeed in obtaining the accounts of a few of the Japanese concerns having local offices in Seattle. In 1930, plaintiff collaborated with a man by the name of Charles E. Martin in the publishing of a book entitled "Japan, an Interpretation," which was obviously pro Jap-

anese propaganda which plaintiff testified was written with the hope that it might be accepted as a textbook at the University of Washington. He testified that it was customary for him to receive at Christmas of each year gifts of a value of about $50 from the Seattle Japanese Consul. These gifts continued up until Christmas of 1940. On one occasion, plaintiff went to Victoria, B. C., where, along with a group of American newspapermen, he interviewed the incoming delegation of Japanese representatives to the London Naval Conference. He was not connected with any newspaper or publication at the time. He had a Japanese girl as his secretary. In May, 1931, at the expense of the Japan Society of Seattle, he went with a group of young men to Japan. He visited the various cities of Japan; took courses in Japanese schools on two occasions; he visited with several prominent personages connected with the Japanese Government; he went on into Manchuria and spent sometime there and then returned to Japan and, in September, returned to the United States. In the fall of 1931, he resigned as secretary of the Japan Society and continued with his advertising agency. In 1932, he became a candidate for the City Council in Seattle. He testified that during that campaign he was dubbed "Banzai Holden" and was so caricatured in one of the Seattle papers. In the fall of 1932, he conceived the idea of publishing a magazine known as the Oriental Outlook. The publication of that magazine he moved to San Francisco and actually published and distributed magazines during the months of February and March, 1933. The most damaging testimony to plaintiff consisted of the introduction of the sample and the two regular issues of that magazine. In the sample copy, he wrote an editorial bitterly criticizing the then Secretary of State, Mr. Stimson, for his failure to protest against the Chinese attacks upon Japanese in Manchuria and for his efforts to convene the signatories of the Nine-Power Pact in order that they might fulfill their obligation to respect the territorial integrity of China. In the February issue, he published an article by Inazo Nitobe, Japanese philosopher, entitled "How the East and West are blending," in which Alexander the Great was glorified because of his encouragement that his soldiers "take Oriental wives so that racial differences and discord may vanish." He printed an article entitled "The frontier of

peace" in which it was said: "When we contemplate the anarchy into which all Eastern Asia would be plunged were Japan, which is now the great buffer between ourselves and the Communistic dreams of Soviet Russia, to be defeated in her great task of restoring order in Eastern Asia, we ought to realize the duty of all true Americans, for their own sakes, as well as in the interest of China and Japan, to make no move such as may endanger the maintenance of our frontier of peace in the Orient." In the March issue of his magazine, plaintiff compared the United States with Japan and urged the "abandonment by the new Administration of the Stimson policy." He referred to the Japanese conquest of Manchuria as "a laudable undertaking in support of which the United States should 'offer assistance and cooperation.'" He printed an article which he subheaded "Our Policies in Latin America Parallel Japan's Actions in Asia." In an editorial written by himself, he said: "Every power in Christendom, the very nations which today have 'outlawed' Japan, have themselves ravaged helpless China in days gone by. What sham and hypocrisy that England and France, with colonial empires girdling the globe, should now condemn Japan! Is international justice to be swayed by political expedience? Can America righteously point the finger of scorn at Japan, without putting on sackcloth and ashes for her misdeeds in Latin America? * * * Has Japan ever, in her diplomatic relations, endeavored to deal from the bottom of the deck, or indulge in the duplicity commonly attributed to European statesmen?" He printed an article by Gerald Girard, who declared: "If the world sincerely wants peace, Japan has shown the only way by which it can be permanently assured. Any other course would be an absurd and impractical substitute which would inevitably lead to greater chaos and disorder. Only those who refuse to face realities will deny that 'Japan implicitly believes in the sanctity of treaties, including the Covenant of the League and the Pact of Paris and the Nine Power Treaty.'" This magazine, however, soon folded up and the plaintiff secured employment with the Pacific Coast Council on Oriental Relations. In the financial difficulties resulting from that failure, plaintiff employed an American-born Japanese lawyer to represent him. Sometime thereafter, he toured the State of Washington making speeches in all communities

of over five thousand inhabitants in support of the program for extension of the quota provisions of the Immigration Acts to Orientals. This organization, like the Japan Society of Seattle, had a roster consisting of many businessmen and educators who were entirely sincere in the belief of the desirablity of the program which they sponsored. After a period of employment by this organization, plaintiff worked on two Eastern Washington newspapers and then, in 1936, took up his present employment with the Spokane Spokesman-Review. His only important Japanese activity during the next few years was the using of his influence to prevent Upton Close from delivering a speech critical of Japan on the campus of the University of Washington. The testimony discloses that, in 1939, when legislation was pending before the United States Senate looking towards the embargo of the shipment of scrap iron and steel to Japan, plaintiff, who was in the state capital as a newspaper reporter, was twice consulted by representatives of Japan concerning a proposed Memorial to be passed by the Legislature requesting the adoption of the legislation by the Congress. There is nothing in the evidence to indicate that he attempted to defeat the adoption of such a Memorial. Last year, after Pearl Harbor, plaintiff had contacts with the Japanese in Spokane. However, the only testimony of any importance concerns an article which he wrote in the Spokesman-Review for February 18, 1943, concerning one Hugh Kasai who, having been classified as a dangerous enemy alien, was interned in Louisiana and who was permitted to return to Spokane to attend the funeral of his brother. In that article, plaintiff pointedly mentioned the necessity of Kasai spending $800 to pay the expenses of guards to bring him back to Spokane. The plaintiff was openly critical of the policy of our Government which saw fit to intern Kasai and wrote an article which cannot be construed other than an attempt to create prejudice in favor of the Japanese alien whom the Enemy Alien Board of Spokane had deemed so dangerous that he needed to be interned. Plaintiff's testimony substantially corroborated the statements in the "Pic" article about his activities in the Masuda case.

On the issue of damages, plaintiff submitted his own and his wife's testimony as to his mental suffering resulting from the article. He testified he received many

phone calls and letters concerning it which interfered with his work and that he had received no salary increase since the article was published. This he attributed in part to the article. He testified that he had been restricted in reporting on military activities because of antagonisms created by the article. He testified that this restriction was important because of the fact that prior to the publication a large portion of his assignments involved work of this character. In addition, the advertising director of the Spokesman-Review testified as to the reaction to the article by the men in New York through whom the paper secured national advertising.

In their motion for new trial, defendants note the ground "Excessive damages appearing to have been given under the influence of passion or prejudice" but at no place in their extensive brief is this point urged. They argue only that there was no proof of substantial damages which would justify more than a nominal recovery.

██ Defendants contend that the article involved was not libelous per se and that, since special damages were neither alleged nor proved, their motions for dismissal both prior to trial and at the conclusion of plaintiff's evidence should have been granted. The Washington Supreme Court in Wilson v. Sun Publishing Company, 85 Wash. 503, 514, 148 P. 774, 778, Ann.Cas.1917B, 442, defined as libelous per se articles which " * * * by writing, printing, picture, effigy, sign or otherwise than by mere speech, shall tend: (1) To expose any living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse; or * * * (3) to injure any person, corporation or association of persons in his or their business or occupation, * * *". See, also, Quinn v. Review Publishing Company, 55 Wash. 69, 104 P. 181, 133 Am.St.Rep. 1016, 19 Ann.Cas. 1077; Wells v. Times Publishing Company, 77 Wash. 171, 137 P. 457; Luna de la Peunte v. Seattle Times Company, 186 Wash. 618, 623, 59 P.2d 753, 105 A.L.R. 932. A publication need not charge a crime in order to be libelous. Lathrop v. Sundberg, 55 Wash. 144, 104 P. 176, 25 L.R.A.,N.S., 381. In determining whether an article is libelous per se, it should be read as a whole. Graham v. Star Pub. Co., 133 Wash. 387, 233 P. 625; Luna de la Peunte v. Seattle Times Company, supra. "While it is true that the meaning of words as published cannot be altered or extended by conclusions of the pleader, yet the ultimate test as to whether or not they are defamatory is the sense in which they would ordinarily and reasonably be understood by the recipients. 3 Restatement of the Law of Torts, p. 147, § 563. Miles v. Wasmer, Inc., supra [172 Wash. 466, 20 P.2d 847]. In determining how the recipients would understand the words used, account may be taken of the circumstances under which they were published in so far as they were known to the recipients. * * * Words which are harmless in themselves may be defamatory in the light of surrounding circumstances." Ziebell v. Lumbermens Printing Company, 14 Wash. 2d 261, 268, 127 P.2d 677, 680. Viewed by these standards, the libelous character of this publication cannot be doubted. It was published during December, 1942, at a time when, for a year, we had been at war with Japan. Without question, the Japanese race was then hated and reviled by the recipients of this magazine. This article, indexed as "America Last", in which the plaintiff was referred to as "a pal of the Japanese" who joined with one whom the article portrayed as an "Unamerican" disciple of Fascism to smear the Congress of the United States certainly exposed plaintiff to hatred, contempt, ridicule and obloquy and injured him in his occupation. Recipients of the publication would reasonably construe the article to mean that plaintiff and Albi were actuated in the formation and publicizing of "Bundles for Congress" by a desire to further the ends of Japan and Italy.

██ Defendants next assert that judgment should be entered in their favor because of lack of proof of publication by them. When defendants so contend, they clash head on with their position taken throughout the trial and upon the motion for new trial that they were entitled to open and close the case for the reason that they had, by their pleadings, admitted publication. Under Federal Rules of Civil Procedure, Rule 8(e) (2), 28 U.S.C.A. following section 723c, "A party may also state as many separate claims or defenses as he has regardless of consistency * * *." The giving of full recognition to that rule does not permit a defendant to avoid taking a stand during the proceedings as regards utterly irreconcilable defenses. Aside from that question, however, defendants' position on this particular

point is without merit. The testimony shows that the defendant Company purchased and sold 387,909 copies of this magazine of which 2,418 were sold in Spokane. Defendants urge that there was no proof that anybody read this article. I would dislike so to stretch my imagination as to accept this contention. However, there is proof that the article was read. Plaintiff and his witnesses testified as to the receipt of many telephone calls and letters received from persons who had read the article. One of these came from as far distant as the City of New York. "Every sale or delivery of a written or printed copy of a libel is a fresh publication and every person who sells or gives away a written or printed copy of a libel may be made a defendant unless, in the meantime, he can satisfy the jury that he was ignorant of the contents." Newell, Slander and Libel, Sec. 256. This last issue was completely and fully submitted to the jury in the instructions of which defendants have made no complaint either at the time of the trial or in the argument on this motion.

The defendants' next contention is that the truth of the article was so thoroughly established as to leave no issue of fact for the jury's determination. "Defamatory words are presumed to be false until proven to be true. The onus of such proof lies on the defendant." Ecuyer v. New York Life Insurance Company, 101 Wash. 247, 255, 172 P. 359, 362, L.R.A. 1918E, 536. The partial truth of an article does not detract from its libelous or damaging nature. Luna de la Peunte v. Seattle Times Company, 186 Wash. 618, 625, 59 P.2d 753, 105 A.L.R. 932. The question of the truth or falsity of an article is one to be submitted to the jury. Quinn v. Review Publishing Company, 55 Wash. 69, 104 P. 181, 133 Am.St.Rep. 1016, 19 Ann.Cas. 1077. No one can deny that defendants presented a powerful case upon the issue of truth. It is difficult to comprehend how any intelligent person reared in the atmosphere of American democracy and schooled in the facts of American history could have become so imbued with foreign philosophy as to have written and published the articles, the writing and publication of which the plaintiff admitted at this trial. I said during the trial that in the publication of the "Oriental Outlook," with its defense of Japan's seizure of Manchuria, its criticism of Secretary Stimson's efforts to force Japan's recognition of its solemn obligations under the Nine Power Pact, its drawing of a parallel between the activities of our Government and that of Japan in Korea, Formosa and Manchuria, its exaltation of Alexander the Great's practice of urging intermarriage between Whites and Orientals, the plaintiff put America last. Review of the record in this case has not changed my opinion in that regard. Nonetheless, I am convinced that the issue was one for the jury. This article, taken as a whole, charged this plaintiff with giving aid and comfort to an American enemy during time of war. It must be judged, as the Washington State Supreme Court said in Ziebell v. Lumbermens Printing Company, supra, in the sense in which it would "ordinarily and reasonably be understood by the recipients. * * * Account may be taken of the circumstances under which" the article was "published in so far as they were known to the recipients." The article must be judged in the light of surrounding circumstances. Plaintiff was entitled to have the jury pass on the question as to whether in publicizing "Bundles for Congress" he was actuated by unpatriotic motives. Furthermore, plaintiff presented the testimony of a number of highly responsible persons as to his loyalty. This testimony, in itself, raised an issue which necessarily had to be submitted to the jury.

The most troublesome problem in this case is raised by defendants' contention that plaintiff's failure to prove malice in the publication of this article by these defendants requires the dismissal of this action. Where no question of privilege is involved, the proof of malice is unnecessary. Wilson v. Sun Publishing Company, 85 Wash. 503, 515, 148 P. 774, Ann. Cas.1917B, 442; McKillip v. Grays Harbor Publishing Company, 100 Wash. 657, 171 P. 1026; Hollenbeck v. Post-Intelligencer Company, 162 Wash. 14, 18, 297 P. 793; Ziebell v. Lumbermens Printing Company, 14 Wash.2d 261, 266, 127 P.2d 677. However, each defendant pleaded affirmatively that the plaintiff and Albi "placed themselves in the public eye and made themselves and their acts the objects for fair editorial comment and criticism and that the article involved is composed of facts, background and fair editorial criticism." In Fahey v. Shafer, 98 Wash. 517, 522, 167 P. 1118, 1120, the State Supreme Court said: "In this state malice is not ordinarily an essential element in the civil action for damages for libel or slander. * * *

But this is not true in cases involving the qualified privilege. In such cases actual malice must be proved before there can be a recovery. This follows from the very nature of the privilege, which in itself is a complete defense in the absence of malice. The burden in such cases is upon the plaintiff to prove the existence of malice. * * * Whether a statement, if made in good faith and without malice, is privileged, is a question for the court. But if there is any evidence reasonably tending to show actual malice, the plaintiff has the right, notwithstanding the privileged character of the communication, to have the question of malicious excess of privilege submitted to the jury upon such evidence. * * * Where the qualified privilege exists, and the court can see that the language used will warrant no inference of malice, and there is no other proof of malice, it is the duty of the court to grant a nonsuit." This doctrine was affirmed in the later case of Ecuyer v. New York Life Insurance Company, 101 Wash. 247, 256, 172 P. 359, 362, with the restriction that "whether bona fides existed in the statement made, or whether it was malicious, is usually a question of fact for the jury. * * * This the jury must determine from the language itself and the surrounding circumstances." The difficulty in the problem evolves from the use in Graham v. Star Pub. Co., 133 Wash. 387, 233 P. 625, 626, of this language: "The privilege ends when falsity begins, and if, as the complaint alleges, the charge is false the privilege, if there was one, was therefore exceeded." It takes but casual analysis to appreciate the sharp conflict between these two holdings. In Washington, the doctrine that truth constitutes a complete defense has been recognized since Haynes v. Spokane Chronicle Publishing Company, 11 Wash. 503, 39 P. 969. Since truth is a complete defense, resort to the defense of privilege only becomes necessary when falsity is involved. It necessarily follows, therefore, that if Graham v. Star Pub. Co., supra, correctly states the rule, the defense of qualified privilege is, for all practical purposes, abolished in this state. The language of Graham v. Star Pub. Co., supra, is broad enough to justify the conclusion that the rule applies to absolute privilege as well. This conflict between the two rules makes necessary an examination of later cases. There only are three cases in which the question arose. In Hollenbeck v. Post-Intelligencer Com-

pany, 162 Wash. 14, 19, 297 P. 793, the Star Publishing Company case was cited and the language "the privilege ends when falsity begins" was repeated. In Miles v. Louis Wasmer, Inc., 172 Wash. 466, 469, 20 P.2d 847, 848, both cases are cited and both rules are stated and the court used the following language: "Defamatory words spoken of a person, which in themselves prejudice him in his profession, trade, vocation, or office, are slanderous and actionable *per se,* unless they are either *true or privileged.* 36 C.J. p. 1165; Ecuyer v. New York Life Insurance Company, 101 Wash. 247, 172 P. 359, L.R.A.1918E, 536." (Emphasis mine) In the very next paragraph, the following language is used: "Words spoken, however, which are not in fact true, are not privileged, because, as stated in Graham v. Star Pub. Co., 133 Wash. 387, 233 P. 625, 626, '* * * the privilege ends when falsity begins, and if, as the complaint alleges, the charge is false, the privilege, if there was one, was therefore exceeded.'" However, between the apparently irreconcilable language just quoted, the following appears: "Words spoken concerning matters of public interest, such as matters concerning the administration of government, matters relating to the management of public institutions and local authorities, and matters pertaining to the administration of public justice are within the rule of qualified privilege, *if true.*" (Emphasis mine) In Fahey v. Shafer, supra, and Ecuyer v. New York Life Insurance Company, supra, the privilege claimed was that defined by Newell, Slander and Libel, 2d ed. p. 391, as concerning a communication "made touching a matter in which the party making it has an interest to another having a corresponding interest." In the Fahey case, the parties were business rivals and the statements involved were made to the Seattle Ad Club and to certain wholesale clothing manufacturers. In the Ecuyer case, the statements were made concerning plaintiff's alleged defalcations to the plaintiff's father and to individuals and firms with whom plaintiff had made application for employment. On the other hand, the publication involved in Graham v. Star Publishing Company concerned the official conduct of the plaintiff who was a member of the Seattle Police Department. The broadcast involved in Miles v. Wasmer, Inc., supra, was by a radio commentator who was discussing the question of prohibition. In the opinion of Hollen-

beck v. Post-Intelligencer Company, supra, the court did not reach the question as to whether privilege actually was involved. The case was considered by the Supreme Court on the basis of the demurrer which had been sustained by the trial court to the plaintiff's complaint.

 From the foregoing, it is possible to reconcile the apparently irreconcilable positions taken by the Washington court; this, despite the fact that that court itself has never attempted so to do. In those cases arising out of communications where the privilege claimed is based upon the fact that the communication is "made touching a matter in which the party making it has an interest to another having a corresponding interest", the falsity of what is spoken or written does not destroy the qualified privilege in the absence of malice. In those cases, the rule enunciated in Ecuyer v. New York Life Insurance Company, supra, controls. In cases where the words spoken or written concern "matters of public interest, such as matters concerning the administration of government, matters relating to the management of public institutions and local authorities, and matters pertaining to the administration of public justice," the helping hand of the qualified privilege is only given to those whose words or writings are true. In those instances, the rules in Graham v. Star Pub. Co., supra, and Miles v. Louis Wasmer, Inc., supra, control. Since the defendants here seek the protection of the latter type of privilege, the issue of malice was not involved in this case. The jury found the article to be false. Consequently, whether malice existed was immaterial.

Such a distinction is required if there is to be any recognition of the defense of privilege in the law of Washington. If the language of Graham v. Star Pub. Co., supra, is taken literally, no one in this state would dare even to report court proceedings or the activities of any legislative body. The phrase, "The privilege ends when falsity begins" is attractive but dangerous because of its very attractiveness. It is, as Mr. Justice Frankfurter said in Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 68, 63 S.Ct. 444, 452, 87 L.Ed. ——, 143 A.L.R. 967, "an excellent illustration of the extent to which uncritical use of words bedevils the law. A phrase begins life as a literary expression; * * * and repetition soon establishes it as a legal formula, undiscriminatingly used to express different and sometimes contradictory ideas." This construction and distinction is in line with the rule in the great majority of states. See note 110 A.L.R. 412. The reason for the distinction is best outlined by Judge (later Mr. Justice) Holmes in Burt v. Advertiser Newspaper Co., 154 Mass. 238, 28 N.E. 1, 4, 13 L.R.A. 97, as follows: "But there is an important distinction to be noticed between the so-called privilege of fair criticism upon matters of public interest and the privilege existing in the case, for instance, of answers to inquiries about the character of a servant. In the latter case a bona fide statement, not in excess of the occasion, is privileged, although it turns out to be false. In the former what is privileged, if that is the proper term, is criticism, not statement; and however it might be if a person merely quoted or referred to a statement as made by others, and gave it no new sanction, if he takes upon himself in his own person to allege facts otherwise libelous, he will not be privileged if those facts are not true. The reason for the distinction lies in the different nature and degree of the exigency and of the damage in the two cases. In these, as in many other instances, the law has to draw a line between conflicting interests, both intrinsically meritorious. When private inquiries are made about a private person, a servant, for example, it is often impossible to answer them properly without stating facts, and those who settled the law thought it more important to preserve a reasonable freedom in giving necessary information than to insure people against occasional unintended injustice, confined, as it generally is, to one or two persons. But what the interest of private citizens in public matters requires is freedom of discussion rather than of statement. Moreover, the statements about such matters which come before the courts are generally public statements, where the harm done by a falsehood is much greater than in the other case. If one private citizen wrote to another that a high official had taken a bribe, no one would think good faith a sufficient answer to an action. He stands no better, certainly, when he publishes his writing to the world through a newspaper, and the newspaper itself stands no better than the writer."

The same distinction was made by Chief Justice Taft when he was a Circuit Judge and wrote the opinion in Post Publishing Co. v. Hallam, 6 Cir., 59 F. 530, 540. He

said: "The existence and extent of privilege in communications are determined by balancing the needs and good of society against the right of an individual to enjoy a good reputation when he has done nothing which ought to injure it. The privilege should always cease where the sacrifice of the individual right becomes so great that the public good to be derived from it is outweighed. Where conditional privilege is extended to cover a statement of disgraceful fact to a master concerning a servant or one applying for service, the privilege covers a bona fide statement, on reasonable ground, to the master only, and the injury done to the servant's reputation is with the master only. This is the extent of the sacrifice which the rule compels the servant to suffer in what was thought to be, when the rule became law, a most important interest of society. But, if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with a single person or a small class of persons, but with every member of the public, whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable ground. We think that not only is such a sacrifice not required of every one who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good."

Defendant American News Company contends its motion for dismissal should have been granted on the theory that its evidence of lack of knowledge of this article on its part was not disputed. Whether lack of knowledge is a defense is doubtful in view of Miles v. Louis Wasmer, Inc., 172 Wash. 466, 472, 20 P.2d 847, 849. In that case, no one claimed that the corporation which owned the radio station had any knowledge of the defamatory matter which the other defendants broadcast. Concerning the liability of the owner of the station, this was said: "As to the appellant Louis Wasmer, Inc., it seems to us that there is a close analogy between the words spoken over a broadcasting station and libelous words contained in a paid advertisement in a newspaper. The owner of the station furnished the means by which the defamatory words could be spoken to thousands of people. It operated the station for profit and received compensation for the time that it was being used." The Washington court then cited with approval Sorensen v. Wood, 123 Neb. 348, 243 N.W. 82, 82 A.L.R. 1098, and approved of the following quotation: "It has often been held in newspaper publication, which is closely analogous to publication by radio, that due care and honest mistake do not relieve a publisher from liability for libel. In Peck v. Tribune Co., 214 U.S. 185, 29 S.Ct. 554, 555, 53 L.Ed. 960, 16 Ann.Cas. 1075, Mr. Justice Holmes said: 'If the publication was libelous, the defendant took the risk. As was said of such matters by Lord Mansfield, "Whenever a man publishes, he publishes at his peril." ' " Furthermore, this defendant did have knowledge through its agent Hawksley. The testimony discloses that some weeks before this edition of Pic Magazine was placed upon the stands, Hawksley received a letter from Pic calling his attention to the article and informing him that a large number of placards advertising the article was being sent him for display in Spokane. Hawksley's duties consisted of the distribution of magazines for the defendant company throughout the Spokane area. A corporation is liable for the publication of a libel by its officers and agents if such publication was within the scope of their employment. Ecuyer v. New York Life Insurance Company, 107 Wash. 411, 421, 181 P. 871, 186 P. 327. In support of their position on this point, defendants rely upon Whitehouse v. Cowles, 48 Wash. 546, 93 P. 1086, 1087. Cowles was sued as the publisher of The Spokane Spokesman-Review. The trial court directed a verdict for him. The Supreme Court affirmed the action, saying: " * * * at the trial there was no competent evidence to prove that he was the publisher of the paper on the 19th of July, 1904, the date when the offending article appeared." So far as the present point was involved, that was the sole basis of the Washington Court's ruling. The issue of knowledge or lack of knowledge was fully presented to the jury by instructions to which no exception was taken.

Relying on Wilson v. Sun Publishing Company, 85 Wash. 503, 148 P. 774, Ann.Cas.1917B, 442, defendants urge that plaintiff's proof as to damages was insufficient to justify a verdict for more than nominal damages. That case was brought by partners who sought to recover for damage to their restaurant business. The partnership books did not support their contention that the restaurant had lost

business as a result of the offending articles. In the present case, the claim is for damages to the plaintiff as an individual. Under these circumstances, he is entitled to rely on evidence of aversion of his friends and acquaintances. Luna de la Peunte v. Seattle Times Company, 186 Wash. 618, 626, 59 P.2d 753, 105 A.L.R. 932. Newell in his work on Libel and Slander, 3d Ed., Sec. 995 (an authority most consistently quoted by the Washington Supreme Court), goes so far as to say: "Where no evidence is offered as to damages, the jury are in no way bound to give nominal damages only; they may read the libel and give such substantial damages as will compensate the plaintiff for such defamation." In Restatement of the Law, Torts, Sec. 621(a), the following is stated: "It is not necessary for the plaintiff to prove any specific harm to his reputation or any other loss caused thereby. Indeed, in many cases the effect of defamatory statements is so subtle and indirect that it is impossible directly to trace the effects thereof in loss to the person defamed. If the plaintiff is able to show a particular pecuniary loss resulting from the defamatory publication, he may recover for the special harm thus caused under the rule stated in Sec. 622. If, however, he is unable to show such definite loss, but the defamatory publication is of such kind and was published under such circumstances as to justify the inference of some general impairment of his reputation, or, through loss of reputation, to his other interests, he is entitled to recover general damages therefor."

## Motions for New Trial

 Defendants assert that error was committed by the denial of their motion for a continuance and the fixing of terms as a condition precedent to granting it. On April 5, after I denied plaintiff's motion to remand this action to the state court, I announced to counsel that the case would be set for trial in the latter part of June and that counsel should take heed that they should be prepared to try it on some date shortly after June 15. In May, notice of the setting for June 28 was sent to counsel. On June 23, defendants made a motion for continuance to July 12 and filed in support thereof an affidavit that certain depositions which had been taken in New York would not be available until July 15. The excuse given was that the stenographer in New York who had taken the depositions was too busy to transcribe them. The plaintiff made a showing that his employers had arranged that he might have his vacation commencing June 28 so as to enable him to attend the trial of this case without any salary loss. He further showed that his two attorneys had set aside ten days of their time for the trial of this case. Upon the hearing on that motion, I informed counsel that a continuance to July 12 actually meant a continuance to September because I did not intend to call any jurors back during the summer months. I denied the motion with permission for its renewal on June 28. On that date, defendants again renewed their motion supporting it by additional telegrams from New York lawyers asserting the impossibility of securing the depositions before July 15. I granted that motion conditioned upon the defendants' paying to the plaintiff the sum of $750. Defendants declined the terms and proceeded to trial. Two days later the depositions which the New York lawyers had asserted could not be ready until July 15 arrived in Spokane and were filed with the clerk. Defendants now strongly urge that $750 was an excessive sum to exact for a continuance from June 28 to July 12. The date of July 12 has no significance. What actually was asked was a continuance to September. I'll concede that $750 was a large sum. However, to have granted this continuance would have inconvenienced the plaintiff, his two lawyers and the Court. I was convinced at the time and my conviction was sustained by later events that defendants' lawyers in New York were simply stalling in an effort to delay the trial of this case. That which they swore could not be produced for seventeen days was produced in two days when the necessity arose. Defendants claim they were prejudiced because the paper printed a story about the terms. They assert that the jury undoubtedly read the story and that this amount influenced the size of the verdict. I held the hearing on the motion in chambers. The order granting the continuance on terms was a matter of public record and I could not prevent the newspaper reporter from seeing it. Because of the nature of the case and the plaintiff's position in the newspaper world, I gave the jury minute and detailed instructions to the effect that they were not to read newspaper articles about this case and that, if they did, they were to disregard such articles. I do not know whether any juror read that par-

ticular article or not. Certainly, everything within my power was done to protect the defendants in this regard.

 Defendants next contend that error was committed in that I instructed the jury that they were privileged to determine the question of the libelous nature of certain portions of the article. No objection was made to the instruction at the time it was given. If it was error, it redounded to defendants' benefit rather than to their detriment. The exceptional situation which existed in this case led me so to instruct the jury. In his complaint, plaintiff had seen fit, instead of alleging that the entire article was libelous per se, to break it down into several parts against which specific complaint was made. I felt defendants were entitled to take advantage of that form of. pleading. Consequently, in my instructions I told the jury that certain of the items were libelous, that certain other items were not libelous and, as to the remainder, I submitted them to the jury for their consideration. I was led to do this because of the reaction of the State Supreme Court to a similar situation in Luna de la Peunte v. Seattle Times Company, 186 Wash. 618, 628, 59 P.2d 753, 757, 105 A.L.R. 932. There, apparently, the trial court was confronted with a similar problem. He met it by the following instruction: "As to the other matters complained of as being libelous, it is for the jury to say whether the publication tends to expose the plaintiff to hatred, contempt, ridicule, or obloquy, or to deprive him of the benefit of public confidence or social intercourse. And if you find from a preponderance of the evidence that the balance of said article is libelous, then plaintiff is entitled to recover such damages, if any, as you find he has sustained." It is true that the State Supreme Court did not approve of that instruction. Concerning it, that court said: "But we think that this instruction was more favorable to appellant than otherwise. For the court left to the jury something which it should itself have determined, namely, that the article, when read as a whole, was libelous per se." Since my purpose in so instructing the jury was solely to give to defendants whatever advantage might accrue from the unique pleading of the plaintiff and since, unquestionably, the instruction could only redound . to defendants' benefit, I cannot feel that they are entitled to a retrial even though what was done may be considered erroneous. Par-

ticularly is this true when no objection was made to it either before the arguments when I outlined to counsel how I intended to instruct the jury or after the instructions when exceptions were supposed to be taken. Ordinarily a trial court is not entitled to rely too heavily upon failure of counsel to make objections during the course of the trial. Where, as here, however, the instruction was explained before argument and counsel given an opportunity to make objection, the failure to object until after verdict to an instruction from which the party benefitted is material in passing upon motion for new trial.

 The defendants contend that the Court erred in refusing them permission to open and close. They assert that they had assumed the burden of proof by admitting publication and that the only issue was the truth or falsity of the article as to which they had the burden. Decision upon this question is complicated by the doubt which ran through the trial and still exists as to whether defendants did admit publication of this article. This entitled plaintiff to open and close. Inglis v. Inglis's Executors, 2 Dall. 45, 2 U.S. 45, 1 L.Ed. 282; Jackson v. Winchester, 4 Dall. 205, 4 U.S. 205, 1 L.Ed. 802. Furthermore, it must be remembered that defendants contended throughout the trial and now, in support of their motion for judgment notwithstanding the verdict of the jury, urge that plaintiff had the affirmative burden of proving malice. That factor alone gave the plaintiff the right to open and close the testimony. Henderson v. Casteel, Fed. Cas. No. 6,350. It thereupon became discretionary with the Court as to whether it would permit a switch in the procedure when it came to the argument. Florence Oil & Refining Co. v. Farrar, 8 Cir., 109 F. 254.

 As a part of their defense, defendants presented the depositions of a number of the officers and employees of the defendant American News Company. The gist of their testimony was that the Company had no knowledge of this article. These officers explained the widespread business of the Company, they outlined its procedure in purchasing magazines from publishers, and explained the impossibility of the Company checking upon the statements made in the many dozens of magazines which the Company purchased and distributed throughout the United States, and they testified at length

as to their reliance upon the publisher. Among the depositions taken by the defendant was that of A. Lawrence Holmes, editor-in-chief of Pic Magazine. This deposition was published but was not offered by the defendants. On rebuttal, the plaintiff offered a portion of the cross examination of Mr. Holmes in which he testified that the article in question was written by United States Senator Homer T. Bone. Plaintiff also took from the deposition and offered in evidence the manuscript submitted by Senator Bone to Pic Magazine and the letter of transmittal from the Senator to the Magazine. These were admitted in evidence. Defendants opposed admission of this testimony and these exhibits on the ground that the testimony and the exhibits were immaterial, irrelevant and not proper rebuttal. They now assert that the admission of this testimony entitles them to a new trial upon these grounds and the further ground that such admission prejudiced the jury in plaintiff's favor. That this testimony and these exhibits were properly admitted is hardly subject to debate. Each defendant pleaded affirmatively as follows: "The article in said December 22, 1942, issue of Pic regarding plaintiff and Joseph Albi, was based on facts and testimony obtained by the publisher thereof from reliable sources and authorities which it and this defendant knew to be reliable, including the Congressional Record of the United States; that the said publisher and this defendant had no reason to believe such facts, data and sources were not reliable and correct and they believed them to be true and correct; that said matters were printed and published in good faith and for the benefit of the public, after careful investigation of the same, the said facts, data and sources and after the submission thereof to legal counsel for approval; that the article was printed and published and was later sold by the defendants to wholesale news dealers in good faith and as facts for the benefit of the public; that this defendant at all times had confidence in the honesty, integrity of the said publisher and believed the said article was in all respects true and correct and never at any time had reason to doubt the truth of the same." In support of that allegation, the defendant submitted depositions of Clifford R. Noble, production manager of the Art Gravure Corporation, and Michael Morrissey, president of the American News Company, Percy D. O'Connell, vice-president of the American News Company, Harold E. Williams, vice-president of the American News Company, William A. Eichhorn, secretary of the American News Company, Frank Feigenbaum, comptroller of the American News Company, all of whom testified as to the reputation of Street and Smith, the publishers of Pic Magazine, the reliability of that company, the reliance which the defendant placed upon the reputation of Street and Smith and the fact that this defendant had been purchasing magazines from Street and Smith for almost fifty years, and that this was the first article published by Street and Smith which was ever questioned. Unquestionably, in the light of that affirmative defense and that testimony, this plaintiff had a right to prove the actual source of the article, the circumstances under which it was received by the publisher and the manner in which it was handled by the publisher. To have held otherwise would have deprived the plaintiff of any opportunity to rebut this testimony submitted by the defendants in support of the allegations of this affirmative defense.

In addition to the points here discussed, defendants urge some twenty other grounds upon which they base their two motions. I have studied all of them. To discuss each would extend this opinion beyond all practical length. I find in none of them sufficient merit to justify further comment. Particularly does this apply to the two last points on which defendants submit argument. Defendants' motions must be denied.