[No. 32780. *En Banc.* May 26, 1955.]

HARVEY OWENS, *Appellant,* v. SCOTT PUBLISHING COMPANY *et al., Respondents and Cross-appellants.*[1]

[1]Reported in 284 P. (2d) 296.

*J. P. Tonkoff* (of *Tonkoff, Holst & Hopp*), and *Skidmore & Critchlow*, for appellant.

*Gavin, Robinson & Kendrick, Halverson & Applegate, H. R. Williams*, and *Fulk & Leeper*, for respondents and cross-appellants.

SCHWELLENBACH, J.—This is an appeal from an order granting a new trial after a verdict of the jury in favor of the plaintiff in the amount of $40,000 in an action for libel. Defendants cross-appeal from orders overruling their demurrer, denying motion for dismissal at close of plaintiff's evidence, refusing to grant a directed verdict, and refusal to grant judgment n.o.v.

Harvey Owens, who is familiarly known as Pat Owens, alleged the following facts in his complaint: that the defendant Scott Publishing Company is a Washington corporation and owner and publisher of the Tri-City Herald, a daily newspaper; that defendant Lee is the chief executive officer of the publishing company and that he writes articles for the newspaper; that plaintiff has been for many years a resident of Kennewick where he had an excellent reputation and was a respected citizen; that prior to April 6, 1952, he had served for many years as a director on the Kennewick School Board; that on April 6, 1952, for the purpose of ruining plaintiff's reputation and exposing him to hatred, contempt, ridicule and obloquy and to deprive him of public confidence and embarrass him publicly, defendant Lee maliciously wrote and the corporate defendant published a false article concerning plaintiff to his damage in the sum of $100,000; that said article was false and untrue, particularly in certain respects.

We shall set out the article in full, italicizing the excerpts which plaintiff alleged were particularly false and untrue, in order that they may be considered in proper context:

"The Way I See It. . . . By Glenn Lee

"Was the School District A Clearing House for Surplus?

"WHEN I WAS A BOY I LIVED on a farm that had a great many rocks on it. With much toil and time we collected the rocks and piled them in large quantities in one location. We would plow around the rockpile and plant seed around it and harvest around it.

"Some animals took a fancy to the rockpile and made their home in it. They prospered and propagated. We might stir up one of the animals away from the rockpile, once in a while, but we could never catch one. He would head for home and wiggle into the rocks and we couldn't budge him.

"The rockpile was a home base; it was a refuge. There was power in the unity and security of the group. Of course we could have moved all rocks and run the animals out, but that was just too big a job. So they stayed. We went about our farm tasks and life went 'around' the family in the rockpile.

"The Kennewick School Board up until the recent election, reminded me of that rockpile. Much power stemmed from the compact character of the school board. It was a rubber stamp board for Black, the superintendent.

"But I have thought for some time now that the board was a rubber stamp for Black and Pat Owens. They ran the show together. It will soon appear as to whether or not this is correct.

"When the hearing gets under way this week it likely will unfold that Pat Owens was a 'big dealer' in surplus of all kinds. Pat bought and sold like a veteran. He did a lot of traveling. He got around to many places. He always seemed to know the ins and outs that got him to the right places at the right time.

"But We Also Know that Black did a lot of traveling too. His expenses show that. Black always had companionship. But the companion, according to the expense accounts, was never Pat Owens.

"Frank Dunham, contractor, built the ball park, with surplus supplies and materials. Pat Owens supplied the supplies and materials. Where did Owens get them? That is a good question for Owens to answer this week on the witness stand under oath.

"*In the course of the ball park construction program it was found that some lumber the school district had in its possession would fill the bill at the ball park. Dunham Construction company, owned and financially backed by L. E. Baldwin of Seattle, obtained the material from the school district.*

"*In paying for it they traded a piece of land to the school district for about $400 worth of lumber. The title to the land at that time was in the name of L. E. Baldwin.*

"*Don Pugnetti and I have read the minutes of the school board meetings several times, but we have never come across this transaction. It must have been voted on at one of those 'special meetings' when no one was around who remembered it. Maybe they just forgot to put it in the book.*

"*Or perhaps they threw it out of the book. There are some pages missing from the minute book. The stubs of the missing pages look like they were slit off with a razor blade. Mutilation or destruction of public records is a dangerous pastime. Whether or not the dates would correspond remains to be seen later.*

"*Now how did Owens get all of this material? Many of the readers of the Tri-City Herald have bumped their noses up against a wall in*

*the past few years trying to buy surplus that was worth anything. It
seemed like a person needed a 'connection' to be able to get surplus.*

"If Owens had a connection, how did he arrange it? We know he
was a good friend of E. S. Black, school superintendent. We know
Black had good connections in getting surplus. He had a top priority
because he represented the school district.

"Keep your eye on the subject of 'priorities' as the hearing unfolds
this week.

*"Huge amounts of surplus materials were shipped to the Kennewick
School District. Where did it all go?* I think John Williams ought to
be asked if he knows anything about whether or not some of it was
used in the contract work he did for the schools. And so should men
like him be asked. Williams' books and records might unfold interesting
things too.

"SCHOOL EMPLOYES like John Atterbury, Everett Dague, Charles
Thuot, John Dickinson and Bill Altrogge might have noticed from time
to time what happened to piles and piles of surplus. Someone must
know where it went.

*"I think more subpoenas will follow this week. Pat Owens, if he
opens up his books, might have quite a story to tell about the purchase
and sale of surplus.*

*"St. Johns Motor Express Company of Kennewick hauled load after
load of lumber and supplies. I think the demand should be made by
the public to have a complete and exact explanation made of where
every stick of it was used.*

*"Representatives of AEC should be called to explain how the ma-
terial was supplied to the school district. Also to Pat Owens. Were
priorities used? Was the material donated or paid for by Owens?*

"Surplus food now seems to play a stronger part in this transaction.
Stories of food becoming rotten and being disposed of also crop up.

"ON VOUCHER 25430, DATED OCTOBER 10, 1947, the school district
bought $500 worth of potatoes in Mt. Vernon and paid freight and tax
of $118. These potatoes were trucked to Kennewick. The spuds were
piled up at Kennewick but it took a long time ·to use that many spuds.
Some spoiled.

"Why were potatoes trucked about 300 miles? We have lots of
potatoes in this area in the lower Yakima Valley.

"I telephoned Maloy Brothers of Mt. Vernon to ask about the trans-
action. Robert Maloy said he might have sold the spuds but he could
not remember the transaction to a school district in Kennewick. He
said that the government had price support under potatoes at that time
and that the government was buying spuds and giving them to school
districts.

"That seems funny, doesn't it? *It does' not add up. Well maybe
the answers are available but they are slow in appearing.*

"But employees of the school cafeteria who bought food and cooked
it and threw out the garbage could probably tell how the surplus food
was used and how the Mt. Vernon potatoes were used. Perhaps they
ought to be called to testify.

"I have sent Mrs. Pearl Wanamaker a letter asking if she will make available a basic list of all surplus received by the Kennewick School District so the public can look it over. It might show up some surprising items.

*"It looks more and more like there was so much free surplus floating around available to school districts that some of it might have been lost in the shuffle."*

The answer set out two affirmative defenses: (1) that the article from which the complaint had taken excerpts was one of a series of articles which constituted fair comment and criticism upon a matter of public interest, and (2) that the facts in the article upon which the comments and criticism were based were true.

At the time that this article was published Pat Owens had been a member of the Kennewick school board for nine years. He had been defeated for re-election the month before and his term of office had expired a week prior to the publication of the article on April 6, 1952. The state auditor had called a public hearing to be held in Kennewick on April 8, 1952, for the purpose of investigating the affairs of the school district.

The trial consumed nearly two weeks. Plaintiff produced considerable evidence tending to support his basic contention that the article was false and was maliciously written and published. Defendants presented considerable evidence which tended to support their defenses that the article was true or substantially so and was written only after careful investigation and in the belief that it was true, and that the article was not maliciously written but was published only to inform the public about a matter of public interest concerning which it was entitled to be informed.

The trial court denied the motion for judgment notwithstanding the verdict and granted a new trial on eight specific grounds.

"1. That Instruction 21 of the Court is legally erroneous in that it attempts to cover the two separate and distinct defenses of qualified privilege and privileged criticism interposed by defendants which were in issue in the case, but the instruction fails to properly define and distinguish the two separate defenses and fails to properly inform the jury

upon such questions to the prejudice of defendants, thus justifying a new trial.

"2. That the Court committed error in failing to give defendants' requested Instruction No. 10, which is a correct and proper definition and statement of privileged criticism, to which Instruction defendants were entitled under the issues and evidence, and the jury was not otherwise properly instructed on such defense, to the prejudice of defendants, thus justifying a new trial.

"3. That the Court committed error in failing to give defendants requested Instruction No. 8, which is a correct and proper definition and statement of the defense of qualified privilege to which Instruction defendants were entitled under the issues and evidence, and the jury was not otherwise properly instructed on such defense, to the prejudice of the defendants, thus justifying a new trial.

"4. That the Court committed error in failing to give defendants requested Instruction No. 9, which is a correct and proper definition and statement of the statutory defense of justification, to which instruction defendants were entitled under the issues and evidence, and the jury was not otherwise properly instructed on such defense, to the prejudice of the defendants, thus justifying a new trial.

"5. That the Court committed error in giving Instructions No. 12 and No. 23 for the reason that same are inconsistent one with the other, Instruction No. 12 having advised the jury as a matter of law that all the complained of portions of the article in question are libelous per se and Instruction No. 23 permitting the jury to make a determination based upon a finding that only parts of the article are libelous and other parts are not libelous, and said inconsistency is not otherwise cured in the instructions, prejudicial to the defendants, thus justifying a new trial.

"6. That the Court erred in failing to give defendants' requested Instruction No. 22 and particularly that portion thereof in which it was proposed that the jury be told that it could not 'assess any damage by way of penalty' for the reason that the case was of a character justifying the giving of such an instruction to the jury and the point was not otherwise covered in the instructions, to the prejudice of the defendants, thus justifying a new trial.

"7. That the amount of the verdict rendered by the jury herein is so excessive as to unmistakably indicate that it was given under the influence of passion or prejudice and such passion or prejudice has so permeated the deliberations of the jury as to render it unjust to hold the defendants

foreclosed by any of the jury findings, thus justifying a new trial.

"8. For the foregoing reasons particularly substantial justice has not been done in this cause, thus justifying a new trial."

It is evident that the court did not give definite reasons as required by Superior Court Rule 16, 34A Wn. (2d) 117, for holding that substantial justice had not been done. Paragraph 8 of the order was merely a recap of the other seven grounds for a new trial.

 A written publication which tends to expose a living person to hatred, contempt, ridicule, or obloquy, or to deprive him of the benefit of public confidence or social intercourse, is libelous *per se*. Section 1, chapter 117, Laws of 1935, p. 329 [*cf.* RCW 9.58.010]; *Ziebell v. Lumbermens Printing Co.,* 14 Wn. (2d) 261, 127 P. (2d) 677; *Gaffney v. Scott Publishing Co.,* 35 Wn. (2d) 272, 212 P. (2d) 817. Defamatory words spoken of a person, which in themselves prejudice him in his profession, trade, vocation or office, are slanderous and actionable *per se,* unless they are either true or privileged. In determining whether the words spoken are defamatory, they must be construed in the sense in which they would ordinarily be understood by persons hearing them. *Miles v. Louis Wasmer, Inc.,* 172 Wash. 466, 20 P. (2d) 847. This rule is also applicable to the libel of a person in his business, profession, or office. 3 Restatement of the Law of Torts, 168, § 569.

 The author of a libelous publication may not be liable in damages therefor, because of certain defenses. The principal defenses to an action upon a publication libelous *per se* are consent, truth, absolute privilege, qualified or conditional privilege, and fair comment or privileged criticism. *Gaffney v. Scott Publishing Co.,* 41 Wn. (2d) 191, 248 P. (2d) 390. We are not here concerned with the defenses of consent or absolute privilege, but shall briefly discuss the other defenses.

 1. Truth.

It is well settled that truth is a complete defense to a

civil action for libel. *Carey v. Hearst Publications,* 19 Wn. (2d) 655, 143 P. (2d) 857. 3 Restatement of the Law of Torts 218, § 582. However, a publication may still be actionable as libel, even though based on true facts, if it contains criticism or comment which tends to expose a living person to hatred, contempt, etc. 3 Restatement of the Law of Torts 156, § 566.

■■ 2. Qualified or Conditional Privilege.

On certain occasions one is qualifiedly or conditionally privileged to publish false and defamatory matter of another and is not liable therefor, provided such privilege is not abused. Facts contained in such communication need not be true, if published without malice, in good faith, and in an honest belief of their truth arrived at after a fair and impartial investigation or upon reasonable grounds for such belief. 3 Restatement of the Law of Torts 241 to 260, §§ 593 to 598. These occasions arise when the publication is for the protection of the interest of the publisher, *Fahey v. Shafer,* 98 Wash. 517, 167 Pac. 1118; the recipient or a third person, *Ecuyer v. New York Life Ins. Co.,* 101 Wash. 247, 172 Pac. 359; persons sharing a common interest, *Chambers v. Leiser,* 43 Wash. 285, 86 Pac. 627; *Ward v. Painters' Local Union,* 41 Wn. (2d) 859, 252 P. (2d) 253; family relationships, *Kimble v. Kimble,* 14 Wash. 369, 44 Pac. 866; public interest, *Stevens v. Haering's Grocetorium,* 125 Wash. 404, 216 Pac. 870. In connection with the last mentioned type of privilege the publication is privileged only when made to a public officer or a private citizen who is authorized to act. The privilege does not extend to a publication to the entire public. 3 Restatement of the Law of Torts 261, § 598.

3. Fair Comment or Privileged Criticism.

The rule is stated in 3 Restatement of the Law of Torts 275 and 279, §§ 606 and 607.

"§ 606.

"(1) Criticism of so much of another's activities as are matters of public concern is privileged if the criticism, although defamatory,

"(a) is upon,

(i) a true or privileged statement of fact, or

 (ii) upon facts otherwise known or available to the recipient as a member of the public, and

 (b) represents the actual opinion of the critic, and

 (c) is not made solely for the purpose of causing harm to the other."

"§ 607.

"(1) The privilege of criticism, stated in § 606, includes a privilege to criticize the public conduct of all officers or employees of the United States, a State or Territory thereof, or a municipal corporation of a State or Territory, and all candidates for such office and applicants for such employment in so far as the conduct of such officer, employee or candidate is a matter of public concern to those to whom the criticism is published."

The latter section states, under "Comment":

"a. The rule stated in this Section is a special application of the general rule stated in § 606. Therefore criticism to be privileged under the rule stated in this Section must conform to the conditions stated in that Section. *The rule stated in this Section is applicable only to defamatory comment and does not afford protection for the publication of false defamatory statements of fact about public officers or candidates for office* (see § 598)." (Italics ours.)

Criticism of the acts of public officials may be vehement, or severe, provided the criticism or comment does not impute crime, misconduct, or improper motives, unless the facts clearly warrant such an imputation. For example, if an official embezzles public funds, it would be permissible to call him a crook and unfit to hold public office. That, under the circumstances, would be a fair comment. However, such criticism or comment must be based on true facts.

As to the cross-appeal we are satisfied that the trial court correctly ruled the publication in question to be libelous *per se.* It imputed to appellant charges of misconduct in office and want of official integrity and fidelity to public trust. *Ziebell v. Lumbermens Printing Co., supra,* and cases and texts cited therein.

Ground 5 upon which the court granted a new trial was that instructions Nos. 12 and 23 were inconsistent, and prejudicial to the defendants.

"INSTRUCTION No. 12.

"As a matter of law the portions of the publication complained of in the article which is in evidence in this case, come within the foregoing definition of libel.

"The law presumes that the defamatory statements in a publication that is libelous per se are false.

"The defendants are liable in damages for the injuries sustained, if any, by plaintiff as a result of said libelous per se publication, unless the defendants have justified said publication."

"INSTRUCTION No. 23.

"When a newspaper publishes an article such as the one in evidence in this case and the portions of such article of which complaint is made intermingles innocent or indifferent statements of fact with libelous statements, it is no defense of such libelous statements to prove the truth of the innocent or indifferent statements.

"In order for the defendants to sustain the defense of truth of such libelous or defamatory matter, the evidence introduced in support of such defense must prove by a fair preponderance of the evidence the substantial truth of each and every defamatory and libelous statement made in such article about which complaint is made, as imputed or interpreted by its ordinary meaning.

"Therefore, if you find that some of the statements complained of were true, nevertheless, if those that remained are libelous—as that term has been defined to you—the defendants have failed to establish their defense of truth.

"On the other hand, if the statements that remain are not libelous, as that term has been defined to you in these instructions, your verdict must be for the defendants."

■ We fail to find any inconsistency in the two instructions which were prejudicial to the defendants. In a prior instruction the court had correctly defined "libel." In No. 12 the judge instructed that the portions complained of, as a whole, were libelous per se. In No. 23 he was discussing the defense of truth. If some of the statements were true and the remaining statements were false, and the statements that remained were libelous, the defendants failed to establish their defense of truth. Then, realizing that by striking some of the statements, those remaining might not then come within the definition of libel, and as a precautionary measure and to the benefit of the defendants, rather than

to their detriment, he instructed the jury that in that event, its verdict must be for the defendants.

Other grounds for granting a new trial were that the court felt that it committed error in failing to give defendants' proposed instructions Nos. 8 and 9.

"DEFENDANTS' PROPOSED INSTRUCTION No. 8.

"If you find from a fair preponderance of the evidence that before the publication of the editorial in question the defendants conducted a fair and impartial investigation of the activities of the Kennewick school board and of the activities of plaintiff as and while a director thereof, which disclosed circumstances inducing the defendants to correctly or reasonably believe the existence of facts affecting a matter of sufficiently important public interest requiring the publication thereof, and that the defendants published the editorial for the purpose of informing the public of such matter of public interest, without malice toward the plaintiff, honestly believing in the truth of the statements therein contained and with reasonable grounds for such belief, then you are instructed that even though you may find any statement in the editorial to be untrue, your verdict must be for the defendants."

"DEFENDANTS' PROPOSED INSTRUCTION No. 9.

"You are instructed the plaintiff alleges that a part of the editorial in question was libelous in that plaintiff has been held in contempt, calumny and ridicule of the public at large.

"You are instructed that in this state a libelous publication is excused when honestly made in belief of its truth and fairness and upon reasonable grounds for such belief and consists of fair comments upon the conduct of any person in respect of public affairs made after a fair and impartial investigation.

"You are further instructed that if you find from a fair preponderance of the evidence that said editorial was honestly made in belief of its truth and fairness and upon reasonable grounds for such belief and consists of fair comments upon the conduct of the plaintiff in respect of public affairs made after a fair and impartial investigation, then your verdict must be for the defendants."

The trial court was of the opinion that the proposed instructions correctly stated the law concerning the defenses of qualified privilege and fair comment. As heretofore pointed out, the defense of qualified privilege does not ex-

tend to a publication to the general public and the defense of fair comment does not afford protection for the publication of false, defamatory statements of fact about public officers or candidates for office.

■ We have heretofore discussed the law in this state with respect to cases involving communications which are qualifiedly or conditionally privileged, pointing out on what occasions one may publish false and defamatory matter of another. However, in those cases where the words spoken or written concern matters of public interest, such as matters concerning the administration of government, public officials and candidates for office, etc., the words spoken or written must be true. For an analysis of Washington cases on this question, see *Holden v. American News Co.*, 52 F. Supp. 24.

We do not wish to recede from the above rule, which is the majority rule in the United States. See annotations, 110 A. L. R. 412 and 150 A. L. R. 358. The author of the annotation in 110 A. L. R. on page 415 states the logical and sound reason for the rule as follows:

"The theory underlying the majority rule is that while it is important that the public be informed of the character, qualifications, and conduct of public officers and candidates for public office so far as they are relevant, the extension of the doctrine of privilege to false statements of fact is not necessary to that end, and should not be permitted, in view of the grave consequences to the individual libeled from the wide circulation of falsehoods and calumnies concerning him. It has also been observed that there is no advantage to the public, but rather to the contrary, from the circulation of falsehoods about officers and candidates for office."

The rule was adopted to prevent the injustice of irreparable harm being inflicted on public officials and candidates for public office. In *Burt v. Advertiser Newspaper Co.*, 154 Mass. 238, 28 N. E. 1, 13 L. R. A. 97, Judge Holmes, speaking for the court, said:

"But there is an important distinction to be noticed between the so called privilege of fair criticism upon matters of public interest, and the privilege existing in the case, for instance. of answers to inquiries about the character

of a servant. In the latter case, a *bona fide* statement not in excess of the occasion is privileged, although it turns out to be false. In the former, what is privileged, if that is the proper term, is criticism, not statement, and however it might be if a person merely quoted or referred to a statement as made by others, and gave it no new sanction, if he takes upon himself in his own person to allege facts otherwise libel*l*ous, he will not be privileged if those facts are not true. The reason for the distinction lies in the different nature and degree of the exigency and of the damage in the two cases. In these, as in many other instances, the law has to draw a line between conflicting interests, both intrinsically meritorious. When private inquiries are made about a private person, a servant, for example, it is often impossible to answer them properly without stating facts, and those who settled the law thought it more important to preserve a reasonable freedom in giving necessary information than to insure people against occasional unintended injustice, confined as it generally is to one or two persons. But what the interest of private citizens in public matters requires is freedom of discussion rather than of statement. Moreover, the statements about such matters which come before the courts are generally public statements, where the harm done by a falsehood is much greater than in the other case. If one private citizen wrote to another that a high official had taken a bribe, no one would think good faith a sufficient answer to an action. He stands no better, certainly, when he publishes his writing to the world through a newspaper, and the newspaper itself stands no better than the writer."

A similar explanation of the rule was given by Chief Justice Taft when he was a circuit judge, in *Post Publishing Co. v. Hallam,* 59 Fed. 530. He said:

"The existence and extent of privilege in communications are determined by balancing the needs and good of society against the right of an individual to enjoy a good reputation when he has done nothing which ought to injure it. The privilege should always cease where the sacrifice of the individual right becomes so great that the public good to be derived from it is outweighed. Where conditional privilege is extended to cover a statement of disgraceful fact to a master concerning a servant or one applying for service, the privilege covers a bona fide statement, on reasonable ground, to the master only, and the injury done to the servant's reputation is with the master only. This is

the extent of the sacrifice which the rule compels the servant to suffer in what was thought to be, when the rule became law, a most important interest of society. But, if the privilege is to extend to cases like that at bar, then a man who offers himself as a candidate must submit uncomplainingly to the loss of his reputation, not with a single person or a small class of persons, but with every member of the public, whenever an untrue charge of disgraceful conduct is made against him, if only his accuser honestly believes the charge upon reasonable ground. We think that not only is such a sacrifice not required of every one who consents to become a candidate for office, but that to sanction such a doctrine would do the public more harm than good."

The newspapers have assumed the responsibility of bringing matters of public interest into the open. The public is entitled to such information. But such information should be true. To extend the rule of qualified privilege, as urged by the newspapers, would create too great a temptation, during the heat of a political campaign or a sincere crusade against waste or corruption in government, to be too careless in their search for truth.

■ The instructions requested by respondents did not correctly state the law and the trial court was in error in granting a new trial for failure to give them.

It is undisputed from the record that the jurors deliberated only a half hour in arriving at the amount of the verdict, after having deliberated for twenty-three hours on the issue of liability. It is also undisputed that the formula used by the jury in assessing damages was based on the evidence that the Tri-City Herald had approximately forty thousand readers. The jury assessed appellant's damages on the basis of one dollar damage for each reader, resulting in a total of $40,000. Though the circulation of the paper and the number of readers were certainly items to be considered by the jury in assessing damages, such a formula was not the sole factor to be considered.

■ Obviously, it was error for the jury to use the total number of readers of the article as the sole yardstick for measuring damages. But that does not mean that the award was given under the influence of passion or prejudice which

permeated the deliberations of the jury. The fact that the jury deliberated twenty-three hours on the question of libel and one-half hour on the question of damages is conclusive that the battle in the jury room was on the question of libel. Having disposed of that issue, the jurors awarded damages on the basis of $1.00 for each reader. The award was the result of calculation (on the wrong basis, it is true), but it definitely was not the result of passion or prejudice.

The court properly and adequately instructed the jury on all phases of the law applicable to the case.

The order granting a new trial is reversed, and the cause remanded with direction to grant a new trial as to the issue of damages alone.

MALLERY, FINLEY, WEAVER, and ROSELLINI, JJ., concur.

DONWORTH, J. (dissenting)—This case (which has been argued three times in this court) presents for decision a very important legal question, namely: Is a newspaper the insurer of the truth of every fact it publishes concerning a public official (or candidate for public office) in connection with his official acts?

The majority opinion answers the foregoing question by saying "Yes." This clarifies the law on the subject of libel in this state and puts an end to the confusion created by *dicta* which has appeared in our decisions from time to time during the sixty-five years of this court's existence. While it is highly desirable to have the law of libel definitely established, I am firmly of the opinion that, for the reasons stated below, the answer to the question should have been "No."

Since newspapers and private citizens are governed by the same law relative to libel, it follows, of course, that the rule established by the majority opinion makes every private citizen the insurer of every fact he has courage enough to publish concerning a public official in connection with his official acts.

My review of the more than sixty slander and libel cases decided by this court since its creation convinces me that the court has never before, except by way of *dictum,* laid down the harsh rule of strict liability set out in the majority

opinion. In this case, for the first time, the court was asked to weigh the relative merits of the so-called liberal and strict rules governing fair comment or privileged criticism as applied to the official acts of public officials. The majority opinion does not discuss or weigh the relative merits of these two rules but, instead, formally adopts the *dictum* of earlier cases.

Before discussing the merits of the two basic rules relating to the law of libel, I desire to consider another matter concerning which I believe the majority is in error, to wit, in brushing aside so lightly the trial court's conclusion that the jury's verdict was the result of passion or prejudice.

*Passion or prejudice*. In the recent case of *Anderson v. Dalton,* 40 Wn. (2d) 894, 246 P. (2d) 853, 35 A. L. R. (2d) 302, this court pointed out that there are two lines of cases dealing with excessive damages: (1) cases in which damages were regarded as excessive but not necessarily involving passion or prejudice, and (2) cases in which damages have been regarded as excessive and given under the influence of passion or prejudice. In that opinion it was said that in most cases we have granted an alternative new trial, giving the prevailing party the option of either remitting a portion of the amount of the verdict or submitting to a new trial. The opinion added, however, that:

"We have not hesitated to grant a new trial unconditionally when we felt that circumstances rendered it likely that the passion or prejudice may not have been confined to the issue of damages but *may have so permeated the deliberations of the jury as to render it unjust to hold a litigant foreclosed by any of the jury's findings.*" (Italics mine.)

In the case at bar the trial judge, who saw what happened in the trial court, decided that passion and prejudice not only "may have," but *did* "so permeate the deliberations of the jury" that it would be "unjust to hold a litigant foreclosed by any of the jury's findings."

Appellant in the present case was a wheat farmer and a cattle raiser. He testified that as a result of the publication of the article complained of he was humiliated and depressed. Though not required to do so by the pleadings, he

attempted to prove special damages by testifying that as a result of the publication he lost some of his customers who previously had purchased cattle from him. He later conceded, however, that he had been able to sell all of his wheat and cattle, despite the fact that it was a bad year in the cattle business and some other cattlemen had not been able to sell their cattle. He also testified that he was shunned by different persons at meetings of his lodge, his club and civic groups as a result of which he suffered great humiliation. The persons named by appellant as those who shunned him were called as witnesses by respondents and each such witness testified he or she had not shunned appellant. Some of them testified that they had not even read the article on which this suit is based and so had no reason to shun him.

During the first oral argument in this court the attorneys for each side stated that it would be difficult for this court to conceive of the supercharged atmosphere in which the case was tried. Under circumstances such as these where the trial judge, who was able to observe the demeanor of the parties, attorneys, witnesses, jurors, prospective jurors, and spectators in the court room, concluded that the verdict was so excessive as to unmistakably indicate that it was given as a result of passion and prejudice, I believe this court should be extremely reluctant to set aside the trial court's order granting a new trial on all issues. By so doing, this court substitutes its judgment for that of the trial judge, merely from reading a cold record which, as the attorneys have stated, cannot convey the supercharged atmosphere in which the action was tried.

In my opinion, there is a considerable difference between asking this court to grant a new trial on grounds of excessive damages in a case where the trial court has refused to do so and in asking this court to affirm an order granting a new trial when the trial court has concluded that, taking all of the circumstances into consideration (including the admittedly supercharged atmosphere in which the case was tried), the verdict is so excessive as to unmistakably indicate that it was given as a result of passion and prejudice. Though

it would not be correct to say that there is a presumption that the trial judge correctly found that passion and prejudice existed in a given case, it certainly is true that the trial judge's finding of passion and prejudice is entitled to *some weight* when this court is reviewing his order granting a new trial. In the present case the majority opinion gives slight weight, if any, to the trial court's finding of passion and prejudice and erroneously grants respondents a new trial limited solely to the determination of the amount of damages.

After my study of the record, I agree with the trial court that the verdict is so excessive as to unmistakably indicate that it was given under the influence of passion and prejudice. Furthermore, I believe it would be unjust to hold defendants foreclosed by the jury's findings on other issues (such as liability) where the jury had returned a verdict of $40,000 damages on the meager showing of damages made here. Such a verdict should, in my opinion, shock the conscience of this court, and should not be permitted to stand. *Kramer v. Portland-Seattle Auto Freight,* 43 Wn. (2d) 386, 261 P. (2d) 692. I, therefore, would grant a new trial as to all issues for this reason alone.

I will now set forth and discuss in order three additional reasons which compel me to conclude that the majority opinion is in error in declining to affirm the trial court's granting respondents a new trial as to all issues in the case:

(1) The trial court gave conflicting instructions on the issue of whether the article was libelous *per se.*

(2) The jury, and not the court, should have decided whether the article was libelous *per se,* inasmuch as the alleged defamation was contained in the innuendoes and insinuations in the article.

(3) The trial court did not instruct the jury correctly on the defenses of qualified or conditional privilege and fair comment or privileged criticism.

(1) *Conflicting instructions.* In *Paysse v. Paysse,* 84 Wash. 351, 146 Pac. 840, this court held that where two instructions given were conflicting, such action constituted

prejudicial error. The holding is well summarized in the first headnote thus:

"In an action for slander in orally charging that plaintiff was a bastard, it is reversible error to give instructions that are contradictory, telling the jury that, in the one charge, the words were libelous *per se,* and in similar charge, that they were not so."

The same thing, in effect, was done by the conflicting instructions complained of in this case. Instruction No. 12 told the jury that *all* of the portions of the article complained of were libelous *per se.* Instruction No. 23 told the jury, in effect, that they might find that some of the portions of the article complained of were not libelous *per se,* and could find for defendants if the defense of truth was established as to other portions of the article which the jury might find to be libelous *per se.*

In my opinion the two instructions (No. 12 and No. 23) were clearly conflicting and hence prejudicial to respondents under the rule enunciated in *Paysse v. Paysse, supra.*

(2) *Libel per se.* In *Gaffney v. Scott Publishing Co.,* 35 Wn. (2d) 272, 212 P. (2d) 817, this court said:

"The determination of whether a writing is libelous *per se* is a matter of law."

Three cases were cited in support of the foregoing proposition. Two of them, *Roane v. Columbia Publishing Co.,* 126 Wash. 416, 218 Pac. 213, and *Graham v. Star Publishing Co.,* 133 Wash. 387, 233 Pac. 625, were decided on demurrers, as was the first *Gaffney* case, *supra.* The third cited case, *Blende v. Hearst Publications,* 200 Wash. 426, 93 P. (2d) 733, 124 A. L. R. 549, was one in which this court concluded that the trial court had erred in denying motions for a directed verdict and judgment n.o.v. and reversed a judgment for plaintiff, holding that the article complained of was not capable of being understood as libelous *per se.*

The rule stated in the first *Gaffney* case, *supra,* is a correct statement of law where the facts are admitted by a demurrer, or on a motion for nonsuit, directed verdict or judgment n.o.v., because only evidence favorable to the plaintiff is considered. But that rule does not mean that

in a jury trial it is always the province of the court to instruct the jury whether the publication sued upon is libelous *per se*. On the contrary, the rule to be followed in instructing a jury, recognized by this court in the first libel case ever appealed to it, *Haynes v. Spokane Chronicle Publishing Co.,* 11 Wash. 503, 39 Pac. 969 (and never over-ruled), is that the court instructs the jury as "what is libel in contemplation of law," and leaves it to the jury to determine whether the article actually is libelous *per se* in the opinion of average readers such as the members of the jury.

The same rule first enunciated by this court in 1895 in the *Haynes* case is given in 3 Restatement, Torts, 304, § 614, in this form:

"(1) The court determines whether a communication is capable of a defamatory meaning.

"(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient[s]."

If the article is so clearly libelous that the minds of reasonable men could not differ regarding it (such as a publication directly charging the plaintiff with murder or robbery), the court will not err in instructing that the publication is libelous *per se,* as a matter of law. *Tennant v. F. C. Whitney & Sons,* 133 Wash. 581, 234 Pac. 666. But if the article is not so clearly libelous or is ambiguous or depends upon insinuations or innuendo for its defamatory meaning, the jury, and not the court, must decide whether it was understood by the average reader as libelous. *Velikanje v. Millichamp,* 67 Wash. 138, 120 Pac. 876; Newell, Slander and Libel, 294; 53 C. J. S., Libel and Slander, 335, § 223; 33 Am. Jur., Libel and Slander, 277, § 294.

Gatley on Libel and Slander, p. 124 (1953) states the rule in this language:

"*Libel or no Libel a Question for the Jury*

"Whether the words complained of are defamatory or not is a question of fact for the jury to decide. But there is always the prior question, Are the words capable of a defamatory meaning? and this is the question for the judge to determine."

See, also, 1 Belli, Modern Trials, 515.

In the case at bar the issue of whether the article was libelous *per se* was in bitter dispute, appellant claiming that it plainly was and respondents that it plainly was not. In ruling orally on the motions for judgment n.o.v. or for a new trial, the judge stated that the question whether the article was libelous *per se* had been "perplexing and elusive throughout the trial, and it still gives the court some qualms." His reason for holding the article libelous *per se* was that the *"insinuations"* in the article were plain, and consequently he felt that the instruction that it was libelous *per se* was justified.

The article did not *directly* charge the appellant with a crime nor with any misconduct, but I agree with the trial court that it contains actionable insinuations and was to some extent ambiguous. By the overwhelming weight of authority everywhere, including the early decisions of this court, it was error for the trial court to instruct the jury that the article was libelous *per se*. The jury should have been instructed that the article was capable of a defamatory meaning, leaving it to the jury to decide whether it was understood as defamatory by the average reader. The fact that the jury deliberated twenty-three hours before deciding that appellant was entitled to recover, after being instructed that the article was libelous *per se,* is ample proof that there were serious doubts in the minds of some of the jurors whether the article was in fact libelous *per se*. In my opinion, the giving of an instruction that the article was libelous *per se* was error which was extremely prejudicial.

(3) *Defenses of privilege.* The defense of qualified or conditional privilege applies only to defamatory statements of *fact* in a publication. The defense of fair comment or privileged criticism applies only to the *comments* or *opinions* of the writer of an article. Since facts and opinions are commonly intermingled through publications, the two defenses mesh with each other and frequently courts fail to make any distinction between these defenses.

In the case at bar, the trial court failed to make any distinction between the two defenses, covering them both

in instruction No. 21 without pointing out that one defense applied to the facts and the other to comments or opinions.

Respondents requested the trial court to give their proposed instruction No. 10, which stated:

"I shall define for you in this instruction the defense of privileged criticism which is available to the defendants. As to factual statements which are true and affect matters of public concern, the defendants have the privilege of stating their opinion based thereon by comment and criticism if such criticism represents the writer's actual opinion and is not made solely for the purpose of causing harm to the plaintiff. If thus privileged, the criticism need not express an opinion with which any person of reasonable intelligence and judgment could possibly agree.

"It need not be reasonably warranted by the facts upon which it is based, and may be prejudiced, fantastic, or extravagant in form and still be thus privileged.

"You are instructed that the activities of the plaintiff, Owens, as director of the school board were matters of public concern within this rule at the time the editorial in question was published."

The proposed instruction is based upon 3 Restatement, Torts, 275-278, § 606, comments c. and d., and is a correct statement of the law as far as it goes. However, § 606, which sets out the principles governing the defense of privileged criticism has a dual aspect and is in effect *two* rules. The first rule, contained in subsection (1), has to do with defamatory criticism of "so much of another's activities as are matters of public concern. . . . " The second rule, in subsection (2), applies to defamatory criticism of the "private conduct or character of another who is engaged in activities of public concern, in so far as his private conduct or character affects his public conduct."

Under subsection 1 of § 606 the criticism or comments upon a public official's activities which are a matter of public concern need not be "reasonable" comment or criticism in order to be privileged (or protected as fair comment). Under subsection 2 of § 606, however, the criticism of, or comments upon a public official's private conduct or character (in so far as his private conduct or character affects his public conduct) must be only such criticism or

comments as "a man of reasonable intelligence and judgment might make."

The reason why the law of libel allows even unreasonable comments or criticism upon true or privileged statements of fact about the *public conduct* of public officials (though not about their private conduct or character) is set out with clarity in 3 Restatement, Torts, 280-281, § 607, comment c., as follows:

"The concern which all citizens have in the proper conduct of public affairs by public officials requires that they have a wide freedom to discuss among themselves the public conduct of their officers and the qualifications of those who seek public office. Those who hold such offices and those who offer themselves as candidates therefor, by so doing subject their public acts to honest criticism even though it be extravagant and unjustified. *To make the critic's protection depend not only upon the sincerity of his criticism but also upon its being such as a reasonable man might make would tend to prevent the public from knowing much essential criticism. The advantages gained by the freedom of discussion stated in this Section are therefore sufficient to outweigh the danger that the reputation of public officers or candidates may suffer thereby.*" (Italics mine.)

This rule means that a critic is entitled even to make comments or express opinions which the public can see are ridiculous, extravagant, foolish or unreasonable if he confines his comments or criticism to true or privileged statements of fact about the public conduct of a public official.

Prosser on Torts, pp. 843-844, uses the term "fair comment" instead of "privileged criticism," and puts the rule this way:

"The comment must be 'fair'—not in the sense that the opinion must be one with which any person of reasonable intelligence or judgment could agree, since freedom of discussion means that foolish and prejudiced opinions must be equally privileged: and not in the sense that it must be moderate, since denunciation, ridicule, and exaggeration for literary effect may be the fittest weapons to employ against error. It must rather be directed and confined to the facts which are a matter of public concern, and not go beyond them, as by attacking the personal character of the author of a book; and it must represent the critic's

honest opinion, and be published, in part at least, for the bona fide purpose of giving the public the benefit of comment which it is entitled to have, rather than for any ulterior motive of harm to the plaintiff."

I think the foregoing rule correctly states the law in respect to comments upon matters of public interest, including comments upon the public conduct of public officials. An almost identical rule is now the law in England, where Parliament enacted the Defamation Act in 1952 to govern libel and slander actions. Gatley on Libel and Slander, 4th ed. pp. 354-356.

In the case at bar, respondents were entitled to have their proposed instruction No. 10 given since the instruction on fair comment given by the trial court was insufficient. It was, in my opinion, reversible error for the trial court to refuse to give it.

The remaining instruction requested by respondents and refused by the court was No. 8, which would have told the jury that truth is not the only defense to a publication libelous *per se* and that the verdict should be for respondents if the jury found that they published the article without malice after a fair and impartial investigation and with reasonable grounds for believing the statements of fact in the article to be true.

This proposed instruction raises the legal issue of whether a newspaper is the insurer of the truth of the facts it publishes about public officials regarding matters of public concern.

The majority opinion apparently considers that question no problem at all, and assumes that this court has adopted the rule of strict liability (heretofore mentioned) which places the publisher of news in the same legal category as the keeper of dangerous animals or explosives as far as the law of damages is concerned. Prosser on Torts, 817. In support of that position appellant refers to the legal catchphrase "Privilege ends when falsity begins," which was first used by this court in *Graham v. Star Publishing Co.*, 133 Wash. 387, 233 Pac. 625, and repeated in several subsequent decisions.

In the case at bar, the question of whether the truth of all facts is the only defense available to a defendant in a civil libel action brought by a public official is squarely raised. Consequently, I have read all the decisions of this court relating to civil libel or slander—both those cited by the parties and a number of additional such cases found as a result of my own research. There appear to be more than sixty cases in our reports relating to this subject. After reading and attempting to reconcile them, I am convinced of two things: first, that the law of civil libel in this state is confused, conflicting and badly in need of re-examination and restatement, and second, that this court has never before directly passed upon the question of whether truth of the facts is the only defense to a civil libel action based upon a news article or an editorial written about the public acts of a public official regarding matters of public concern.

The former decisions of this court which purport to lay down the rule that truth is the only defense in such an action fall into several categories:

(1) Cases decided on demurrers. Invariably the demurrers have admitted either (a) actual malice, which destroys any privilege, Newell, Slander and Libel, 382, § 343; 3 Restatement, Torts, 268-269, § 603, comment a.; 53 C. J. S., Libel and Slander, 158, § 100, or (b) have admitted the truth of allegations which affirmatively showed that the publication did not arise out of a privileged occasion, which likewise destroys any privilege. 3 Restatement, Torts, 241, § 593 (a); Newell, Slander and Libel, 382, § 343; p. 387, § 349; 53 C. J. S., Libel and Slander, 139, § 87. Some of our cases fall in both (a) and (b) classifications, as, for example, *Graham v. Star Publishing Co., supra*; *McKillip v. Grays Harbor Publishing Co.,* 100 Wash. 657, 171 Pac. 1026; and *Gaffney v. Scott Publishing Co.,* 35 Wn. (2d) 272, 212 P. (2d) 817. One of our cases in classification (b) is *Hollenbeck v. Post-Intelligencer Co.,* 162 Wash. 14, 297 Pac. 793.

(2) Cases in which the admitted facts or the facts found by the court or jury disclosed that, if there was a privileged

occasion, the privilege was so abused that it was lost. *Byrne v. Funk,* 38 Wash. 506, 80 Pac. 772, is an outstanding example, since the *holding* was that the privilege was exceeded but the court discussed truth and falsity, which were not issues in the case, and laid down rules in regard thereto which have been cited ever since.

I have not undertaken to review all our previous decisions relating to civil libel as to do so would extend this opinion beyond any reasonable length and probably would not result in reconciling those decisions in view of the confused state of legal concept existing in this field of law. A part of the apparent confusion in our cases is traceable to the fact that different terms have been used by different writers to mean the same thing, as for instance, "fair comment" and "privileged criticism." Further confusion has resulted from our failure to observe the distinction between "facts" and "comments or opinions" in libelous writings.

*Facts* may be proven true or false. *Opinions,* properly speaking, cannot be proven true or false, as the dissent in *Gaffney v. Scott Publishing Co.,* 41 Wn. (2d) 191, 248 P. (2d) 390, pointed out. Whether an opinion is the *honest* belief of a writer, or is published because of ill will, spite or ulterior motives, is susceptible of being proven true or false. 3 Restatement, Torts, 278, § 606, comment d.

Because our prior cases do not answer the question of whether truth is the only defense to a libelous article written about a public official, I will refer to the authorities from other jurisdictions.

There are two distinct lines of cases on this subject. One line of cases, rated the majority rule, holds that fair comment on, or criticism of, the acts and conduct of a public official or candidate for public office, about matters of public concern, are privileged in the absence of malice, but the privilege is forfeited if the comment or criticism is based upon a false statement of fact, regardless of whether or not the publisher had reasonable grounds for believing the statement of fact to be true. *Burt v. Advertiser Newspaper Co.,* (1891) 154 Mass. 238, 28 N. E. 1, an opinion by Judge (later U. S. Justice) Holmes, is usually considered the foremost

example of this view. See annotations in 110 A. L. R. 412-441, and 150 A. L. R. 358-365. This state is classified as following the majority view as a result of the *dictum* in *Byrne v. Funk, supra*, reiterated in later cases. One writer has recently stated that Washington has been classified as supporting both rules. See 30 Wash. L. Rev. 36, at page 44.

There is a strong minority view to the effect that even a misstatement of fact about a public official, in connection with matters of public concern, is privileged, and a complete defense to a civil libel action is established if the statement is made for the benefit of the public, without malice and in the honest belief that it is true. Perhaps the leading case in support of the minority doctrine is *Coleman v. MacLennan* (1908), 78 Kan. 711, 98 Pac. 281. The minority view is the one approved by the great majority of the legal writers (especially in recent years), and there are "indications of a tendency to adopt it in decisions departing from earlier cases." Prosser on Torts, 840; 1 Belli, Modern Trials, 512-513.

To those who wish to delve into the historical background and legal philosophy resulting in the adoption of the majority rule of strict liability for any publication concerning the acts of public officials, I cite these authorities: Blackstone's Commentaries (1768), Vol. 3, 123-125; Hallen, Fair Comment (1929), 8 Tex. L. Rev. 41; Noel, Defamation of Public Officers and Candidates (1949), 49 Columbia L. Rev. 875; Spring, Risks & Rights in Publishing, Television, Radio, Motion Pictures, Advertising and the Theatre (Great Britain, 1952) 44-45; Encyclopedia Americana, Vol. 25, 489 (Star Chamber Court).

It is enough to say here that the historical and philosophical reasons for the strict rule appear to me to now have no basis whatever under our modern conditions. The one reason now given by courts which continue to follow the strict rule is that to do otherwise would drive honorable men out of public life since honest men would not offer themselves as candidates for office if the strict rule were relaxed. *Burt v. Advertiser Newspaper Co.*, 154 Mass. 238, 28 N. E. 1.

Those states which have adopted the liberal or minority

rule reply that experience has proven that the single reason given for still adhering to the strict rule is not valid because the candidates and public officers in the "liberal rule" states are as honorable as their counterparts in other states. *Coleman v. MacLennan, supra.*

The minority or so-called "liberal" rule has been adopted in Arizona, California, Georgia, Iowa, Kansas, Minnesota, New Hampshire, North Carolina, Pennsylvania, South Dakota, Utah, Vermont and West Virginia. The District of Columbia has adopted a partial version of the liberal rule. *Sweeney v. Patterson,* 76 U. S. App. D. C. 23, 128 F. (2d) 457. (Cert. denied 317 U. S. 678, 87 L. Ed. 544, 63 S. Ct. 160). The supreme court of Colorado in *Knapp v. Post Printing & Publishing Co.,* 111 Colo. 492, 144 P. (2d) 981, held that a newspaper article written about plaintiff, a candidate for governor, was not libelous *per se.* Though it was not necessary to the decision, the court went out of its way to add as *dictum* that it approved the liberal rule of *Coleman v. MacLennan, supra,* and so it undoubtedly must be classed as now ready to follow that rule.

The supreme court of Texas in 1949 in *Fitzjarrald v. Panhandle Publishing Co.,* 149 Tex. 87, 228 S. W. (2d) 499, adopted a modified form of the liberal rule but refused to sanction as privileged misstatements of fact about a public officer which, if true, would be grounds for his removal from office. The court said that the state had by statute (Art. 5432 R. C. S.) adopted a more liberal rule to "soften the harsh rule that had subjected newspapers to damages for publishing certain matters [about public officials]" but that the liberal rule relating to newspapers "does not apply to the publication of an article not true which would subject a public official to removal from office."

Although the supreme court of Nevada has never passed upon the relative merits of the strict and liberal rules, the U. S. District Court for the district of Nevada, in *Reynolds v. Arentz,* 119 F. Supp. 82, decided February 12, 1954, held that the liberal rule should be applied in that state, after discussing the previous Nevada libel cases.

As far as I have been able to ascertain, with very few exceptions those courts which have had occasion to re-examine the question during recent years have decided that the harsh rule of strict liability imposed upon those who publish articles about public officials is not justified by the realities of the present day. In many instances it creates liability without fault. To follow it now will result, in some cases, in the public's being deprived of information concerning the public acts of public officials because news-papers cannot afford to assume the risk of being unable to prove at any time within the period of limitations the truth of every fact stated in such publication. The basis of legal liability for almost all other torts is negligence on the part of the actor. According to the majority opinion, the pub-lisher is an insurer of the accuracy of all facts stated regardless of the degree of care exercised in gathering and investigating them and regardless of the publisher's rea-sonable grounds for believing the truth of such facts. This standard is impractical in the light of present-day conditions relating to the operation of the newspaper business for the reasons hereinafter stated.

In the case at bar, respondents' proposed instruction No. 8 does not go as far in relaxing the rule of strict liability as the Kansas court did in *Coleman v. MacLennan, supra*.

The instruction would have told the jury that the article would be privileged if the jury found that respondents pub-lished the article without malice after a fair and impartial investigation and with reasonable grounds for believing the statements of fact in the article to be true. Essentially, the basis for recovery under this rule is negligence on the part of the publisher, or failure to have reasonable grounds for believing the facts published to be true. The ground for recovery under the rule in *Coleman v. MacLennan, supra,* is proof of actual bad faith or malice on the part of the publisher.

This court has previously stated that, much as we respect the principle of *stare decisis,* we cannot yield to it when to do so will perpetuate the error of earlier cases, and es-pecially so when no property rights would be affected by

overruling prior decisions. *Schramm v. Steele,* 97 Wash. 309, 166 Pac. 634; *State ex rel. Bloedel-Donovan Lbr. Mills v. Savidge,* 144 Wash. 302, 258 Pac. 1; *Hutton v. Martin,* 41 Wn. (2d) 780, 252 P. (2d) 581. Consequently, *if it can be said* that, by repeating the *dictum* from *Byrne v. Funk, supra; McKillip v. Grays Harbor Publishing Co., supra;* and *Graham v. Star Publishing Co., supra,* in our later cases, this court has held that truth is the only defense in civil libel suits involving publications about public officials, I would expressly overrule the language in cases holding that "privilege ends when falsity begins," or other words of like import. (It should be noted that this would not overrule the result in any of the cases since, under the facts found by court or jury, or the facts admitted by demurrer or motion in each of the prior cases, the result would have been the same whether tried under the "strict" or the "liberal" rule.) In my opinion, the following cases (in addition to the three mentioned above) should be overruled: *Quinn v. Review Publishing Co.,* 55 Wash. 69, 104 Pac. 181; *Miles v. Louis Wasmer, Inc.,* 172 Wash. 466, 20 P. (2d) 847; *Ziebell v. Lumbermens Printing Co.,* 14 Wn. (2d) 261, 127 P. (2d) 677, and *Gaffney v. Scott Publishing Co.,* 35 Wn. (2d) 272, 212 P. (2d) 817. In my opinion, the second decision in *Gaffney v. Scott Publishing Co.,* 41 Wn. (2d) 191, 248 P. (2d) 390, would not be affected since it was decided on the narrow ground that the court was foreclosed by the law of the case doctrine from considering the issue discussed in the present case.

It might be noted here that the late Judge L. B. Schwellenbach in *Holden v. American News Co.,* 52 F. Supp. 24, a well-reasoned case analyzing many of this court's previous civil libel decisions, reached the same basic conclusion that I have, namely, that this court's earlier opinions on the subject of libel are "sharply conflicting." Because we had never done so, he sought to reconcile our cases, and, based on the premise that the *dictum* in *Graham v. Star Publishing Co., supra,* was to be taken as the law in this state (an assumption which he was, of course, compelled to make), his analysis undoubtedly is correct. He concluded,

however, just as I have, that the legal catch-phrase "privilege ends when falsity begins" is "attractive but dangerous because of its very attractiveness," quoting *Tiller v. Atlantic Coast Line R. Co.,* 318 U. S. 54, 68, 87 L. Ed. 610, 618, 63 S. Ct. 444, 452, 143 A. L. R. 967.

Nothing that I have said in this opinion should be construed as implying that newspapers or other publications have any special right to assert the defenses of fair comment and qualified privilege not enjoyed by individuals or other organizations. The rule recognized everywhere, in the "liberal" rule states as well as in the "strict" rule jurisdictions, is that "the press has the same rights as an individual, and no more." *Coleman v. MacLennan, supra.*

But I do believe that both the press and private citizens have a right to state what they reasonably believe to be true about the public acts of public officials and candidates for public office.

I see no logic whatsoever in the statement in *Burt v. Advertiser Newspaper Co.,* 154 Mass. 238, 28 N. E. 1, 13 L. R. A. 97, relied on by the majority, to the effect that:

"What the interest of private citizens in public matters requires is freedom of discussion rather than of statement."

It is inconceivable to me how the public can have any effective or worth-while "discussion" of public affairs and public officials without making some "statements" of faet on which to base expressions of opinion.

In making a deliberate choice between applying the strict rule or the liberal rule to libel cases involving public officers, I think that this court should consider the effect of such choice upon the three classes of persons affected thereby: (1) the public, who have a right to be informed about, and to criticize, the official acts of their public officers, (2) the public officers themselves, and (3) all publishers of such information concerning public officers (using the term publishers as including owners and editors of all periodicals, newspapers, radio and television broadcasting stations, and all individual citizens who either in public speeches or written articles, or in private conversation or correspondence

may criticize the public officials regarding matters of public concern).

I am firmly of the opinion that the adoption of the liberal rule would be fair to all three classes of persons. First, it would be advantageous to the public because it encourages adequate publication and dissemination of news regarding public affairs instead of discouraging such activity by making the publisher guarantee the truth of every fact published, regardless of the thoroughness of his investigation, the reasonableness of his belief that such fact was true, or his lack of malice.

Second, it would furnish adequate protection to public officials because the burden of proving a defense of adequate investigation of the facts, reasonable grounds for believing the facts stated are true, and lack of malice would be placed upon the publisher *as soon as* the plaintiff had shown that the article published was libelous *per se*.

The basis of liability would be the negligence of the publisher (the same as in any tort action) with the exception that in such libel cases the burden of proof would be placed upon the publisher to prove that he had *not* been negligent in the respects mentioned above.

Third, it would afford an adequate defense compatible with the practical operation of a newspaper or periodical (or radio or television broadcasting business) by permitting the publisher to attempt to prove his lack of malice and of negligence in connection with obtaining, evaluating, and publishing the facts, and thus be exonerated from liability *if* he can convince the jury of the validity of his defense.

With the present-day speedy means of communication, news is of no value to the public unless published within a few hours of the happening of an event. The rush to gather, check, investigate and evaluate news requires prompt action. If required to insure the truth of every fact published regarding the public acts of public officers, the publisher cannot be certain until the two-year statute of limitations has run whether he will be required to prove to the satisfaction of a jury the truth of every such fact he has published today. If, for example, such a libel action

should be instituted just before the expiration of the two-year period, by the time the case could be ready for trial the sources of his news may have died, moved away, become ill, forgotten the event, or may then repudiate the statements originally made. In such circumstances the publisher, under the strict rule adopted by the majority opinion in this case, must, at his peril, attempt to prove the truth of each fact stated in the article and, if he fail to do so, must respond in damages, although he was not guilty of any negligence whatever in connection therewith. Thus the publisher must assume the risk of not being able, several years in the future, to prove the truth of facts published today. He can only avoid such risk by declining to adequately inform the public regarding the public acts of public officers. In the event that the publisher refuses to assume this risk, it is the public and not the publisher nor the public officer whose welfare is harmed.

In this dissenting opinion (which is longer than originally intended) I have endeavored to point out both historical and practical reasons for my disagreement with the majority's choice of the strict rule in preference to the liberal rule in this class of libel cases.

Both because there was adequate ground for the trial court's holding that the verdict was the result of passion and prejudice, and because of the errors above noted in the giving and refusing of certain instructions, I would affirm the trial court's order granting a new trial as to all issues.

HAMLEY, C. J., and HILL, J., concur with DONWORTH, J.

OTT, J. (dissenting)—The learned and experienced trial judge, who observed the conduct and demeanor of the jury during the entire trial, and who was present and observed the myriad of incidents that occasioned the trial of this strongly contested case, concluded that, from all he saw and heard, the defendant had not been afforded a fair and impartial trial by a fair and impartial jury.

The laws of the state of Washington guarantee to all litigants appearing before the courts a fair trial. In my opinion, whether this guarantee has been accomplished in any given

case can best be determined by the qualified jurist who tries the case.

The trial judge found that the jury was prejudiced, and that this prejudice was reflected in a shockingly excessive verdict. If, because of prejudice, the verdict is so large as to shock the conscience of reasonable men, how can it be said that such prejudice did not also dominate the jury's decision on the merits?

Our laws guarantee to litigants a fair and impartial jury trial on *all* issues. It was never intended that a litigant must accept a jury to try his case which will be prejudiced in fixing the amount of the recovery, but which may be fair in deciding the issue of whether there should be recovery at all. Upon this finding alone, the trial court should be affirmed.

Further, the trial judge concluded that he committed error in the giving of instructions Nos. 12, 21, and 23, and that he committed error in failing to give requested instructions Nos. 8, 9, 10, and 22. His conclusions in this respect are likewise correct. The preceding dissenting opinion ably expresses the reasons why these instructions were erroneously given and why the requested instructions should have been given. In this regard, I concur in that dissent.

In my opinion, the judgment of the trial court in granting a new trial should be affirmed.

---

September 21, 1955. Petition for rehearing denied.